WINTON, ADMINISTRATOR OF WINTON, ET AL. *v.* AMOS AND OTHERS, KNOWN AS THE MISSISSIPPI CHOCTAWS.

BOUNDS, ATTORNEY-IN-FACT FOR BOUNDS, *v.* SAME.

LONDON *v.* SAME.

FIELD ET AL. *v.* SAME.

BECKHAM *v.* SAME.

VERNON *v.* SAME.

HOWE, EXECUTRIX OF HOWE *v.* SAME.

APPEALS FROM THE COURT OF CLAIMS.

Nos. 6–12. Argued January 14, 15, 1919: restored to docket for reargument January 5, 1920; reargued April 21, 22, 1920.—Decided March 7, 1921.

1. The acts authorizing these suits against Mississippi Choctaws (April 26, 1906, c. 1876, § 9, 34 Stat. 140; May 29, 1908, c. 216, § 27, 35 Stat. 457), contemplate not an action *in personam* to es-

tablish personal liability against individual Indians, or a group of them, but an equitable class suit against those who, by successfully asserting citizenship in the Choctaw Nation, acquired allotments out of the tribal land and participation in funds held in trust by the United States, to impose an equitable charge upon their lands and interests, so acquired, for a reasonable and proportionate contribution towards the value of the services rendered and expenses incurred by the claimants in securing such lands and interests for the class. Pp. 375, 391, 397.

2. The acts, in treating the Indians affected as a class, and in providing for their representation by the Governor of the Choctaw Nation for the purpose of receiving notice of the suit and by the Attorney General of the United States for the purpose of appearing and defending it, and in omitting to make the United States a party, are within the constitutional authority of Congress over tribal Indians and their property, and do not deprive the Indians of their property in violation of the Fifth Amendment, although they are citizens. P. 392.

3. For proper professional services rendered and expenses incurred in successfully promoting legislation to rescue substantial property interests of a class of beneficiaries under a trust of a public nature, it is equitable to impose a charge for reimbursement and compensation upon the interests so secured, the same as if a like result had been reached through litigation in the courts. P. 392.

4. Where such services, enuring to the benefit of a class, are performed under express contracts with some of its members, the party performing them may exact compensation from such individuals directly, under the express contracts if they are valid or under implied contracts if they are not, (in which case they would have contribution from their co-beneficiaries,) or, in avoidance of circuity of action, he may waive his rights under the contracts and proceed against all the beneficiaries directly. P. 393.

5. To sustain such an equitable charge, the services rendered must have been substantially instrumental in producing a result beneficial to the class upon whose interests it is to be imposed. P. 394.

6. Where the acts performed by certain claimants in behalf of a class of Mississippi Choctaws were in part such as to assist in procuring the legislative and administrative measures which secured their property interests, and in part apparently of the opposite tendency, so that the effect of the service as a whole was in doubt, *held*, that the Court of Claims should not have limited its findings to what the claimants did, but should have found specifically on whether

the service was of benefit, and if so, what compensation was equitably and justly due on the principle of *quantum meruit.* P. 395.

7. When requests under Rules 90-95 for additional findings are not filed within the prescribed 60 days after judgment, the Court of Claims has a discretion to reject them upon that ground, but when it rejects them for other reasons evincing a misconception of the case and of the significance of the requested findings, it will not be assumed that they would have been rejected upon the ground of delay if the misconception had not existed. P. 395.

No. 6. Reversed.

Nos. 7-12. Affirmed.

THE cases are stated in the opinion. The decisions of the Court of Claims are reported in 51 Ct. Clms. 284; 52 *id.* 90.

*Mr. William W. Scott,* for appellants in No. 6.

*Mr. Guion Miller* for appellants in Nos. 7–12.

*Mr. Assistant Attorney General Davis* for appellees.[1]

MR. JUSTICE PITNEY delivered the opinion of the court.

These are appeals from a judgment of the Court of Claims rejecting claims for alleged services rendered and expenses incurred in the matter of the claims of the Mississippi Choctaws to citizenship in the Choctaw Nation. The decision of the Court of Claims is reported in 51 Ct. Clms. 284. In the Winton case (No. 6), a request for additional findings, equivalent to an application for rehearing, was denied, 52 Ct. Clms. 90. The appeals were taken under § 182, Jud. Code.

The jurisdiction of the court below arose under an Act of April 26, 1906, ; 1876, § 9, 34 Stat. 137, 140, and an

---

[1] At the first hearing the case was argued by *Mr. Assistant Attorney General Thompson. Mr. Solicitor General King* and *Mr. George M. Anderson* were also on the briefs.

amendatory provision in the Act of May 29, 1908, c. 216, § 27, 35 Stat. 444, 457. The former provided: "That the Court of Claims is hereby authorized and directed to hear, consider, and adjudicate the claims against the Mississippi Choctaws of the estate of Charles F. Winton, deceased, his associates and assigns, for services rendered and expenses incurred in the matter of the claims of the Mississippi Choctaws to citizenship in the Choctaw Nation, and to render judgment thereon on the principle of quantum meruit, in such amount or amounts as may appear equitable or justly due therefor, which judgment, if any, shall be paid from any funds now or hereafter due such Choctaws by the United States. Notice of such suit shall be served on the governor of the Choctaw Nation, and the Attorney-General shall appear and defend the said suit on behalf of said Choctaws."

The original petition was filed October 11, 1906, by Wirt K. Winton, one of the heirs-at-law of Charles F. Winton, in behalf of himself and the other heirs and also in behalf of the associates and assigns of Charles F. Winton. Thereafter it was provided by the amendatory act that the court be authorized and directed to hear, consider, and adjudicate claims of like character on the part of William N. Vernon, J. S. Bounds, and Chester Howe, their associates or assigns, and render judgment on the same principle of *quantum meruit;* the judgment, if any, to be paid from "any funds now or hereafter due such Choctaws as individuals by the United States"; Vernon, Bounds, and Howe were authorized to intervene in the pending suit of the estate of Winton, and it was "*provided further,* That the lands allotted to the said Mississippi Choctaws are hereby declared subject to a lien to the extent of the claims of the said Winton and of the other plaintiffs authorized by Congress to sue the said defendants, subject to the final judgment of the Court of Claims in the said case. Notice of such suit or intervention shall ·

be served on the governor of the Choctaw Nation, and the Attorney-General shall appear and defend the said suit on behalf of the said Choctaws."

Thereafter a second amended petition was filed by Wirt K. Winton, as administrator of the estate of Charles F. Winton, deceased, in behalf of the estate of Winton and also of Winton's associates and assigns. In this petition James K. Jones, administrator of James K. Jones, deceased, and Robert L. Owen, in his own behalf, joined. Intervening petitions were filed by William N. Vernon; Chester Howe, who died pending suit and in whose place his administratrix, Katie A. Howe, was substituted; and several others.

As shown by the findings the claim of Winton and associates arose as follows: By Article 3 of the Treaty of September 27, 1830 (7 Stat. 333), known as the Treaty of Dancing Rabbit Creek, the Choctaw Nation of Indians ceded to the United States the entire country possessed by them east of the Mississippi River, and agreed to remove beyond the Mississippi during the three years next succeeding. But, in view of the fact that some of the Choctaws preferred not to move, it was provided in Article 14 that each head of a family who desired to remain and become a citizen of the States should be permitted to do so, and should thereupon be entitled to a reservation of one section of land, with an additional half section for each unmarried child living with him over ten years of age, and a quarter section for each child under ten. If they resided upon said lands intending to become citizens of the States for five years after the ratification of the treaty, a grant in fee simple should issue; and it was further provided: "Persons who claim under this article shall not lose the privilege of a Choctaw citizen, but if they ever remove are not to be entitled to any portion of the Choctaw annuity." By another article (19) reservations were provided for certain prominent Choctaws by name;

and for limited numbers of heads of families and captains.

The mixed-blood Choctaws who elected to remain in Mississippi were provided for under Article 19, while the full bloods who remained and elected to become citizens of the State were provided for under Article 14; hence, full-blood Mississippi Choctaws have always been called "Fourteenth Article Claimants." Choctaws who remained in Mississippi under that article adopted the dress, habits, customs, and manner of living of the white citizens of the State. They had no tribal or band organization or laws of their own, but were subject to the laws of the State. They did not live upon any reservation, nor did the Government exercise supervision or control over them. No funds were appropriated for their support, though much land was given to them. Neither the Indian Office nor the Department of the Interior assumed or exercised jurisdiction over them, and they never recognized them either individually or as bands, but regarded them as citizens of the State of Mississippi, and the Department held it had no authority to approve contracts made with them.

Pending the negotiation of the treaty, the Legislature of the State of Mississippi passed an Act, January 19, 1830, abolishing the tribal customs of Indians not recognized by the common law or the law of the State, making them citizens of the State, with the same rights, immunities, and privileges as free white persons, extending over them the laws of the State, validating tribal marriages, and abolishing the tribal offices and posts of power. Recognition of their citizenship was afterwards embodied in the state constitution.

The right of the Fourteenth Article Mississippi Choctaws to citizenship in the parent tribe appears to have been recognized at one time by the Choctaw Nation west, which had removed to Indian Territory pursuant to the treaty.

On December 24, 1889, the Nation, through its legislature, memorialized Congress, reciting that there were "large numbers of Choctaws yet in the States of Mississippi and Louisiana who are entitled to all the rights and privileges of citizenship in the Choctaw Nation," and requesting the United States Government to make provision for the emigration of these Choctaws from said States to the Choctaw Nation. In 1891 a commission was provided for and funds appropriated by the Choctaw Council for the removal and subsistence of Mississippi Choctaws to the Nation, and during that year 181 were removed and admitted to citizenship.

By Act of March 3, 1893, c. 209, § 16, 27 Stat. 612, 645; Congress created the Commission to the Five Civilized Tribes, familiarly known as the Dawes Commission, with the object of procuring through negotiation the extinguishment of the national or tribal title to the lands of those tribes in the Indian Territory, either by their cession to the United States or allotment in severalty among the Indians, with a view to the ultimate creation of a State. By Act of June 10, 1896, c. 398, 29 Stat. 321, 339–340, the Commission was directed to make a complete roll of citizenship of each of the Five Civilized Tribes, and applicants for enrollment were to make application to the Commission within three months from the passage of the act and have the right of appeal from its decision to the "United States District Court" (construed by this court, in *Stephens* v. *Cherokee Nation,* 174 U. S. 445, 476–477, to mean the United States Court in the Indian Territory).

At this time the full-blood Mississippi Choctaws were extremely poor, living in insanitary conditions and working at manual labor for daily wages. Their children were not permitted to attend schools provided for the whites, and they were denied all social and political privileges. As already appears, they were receiving neither care nor attention from the Indian Office or the Department of the

Interior; and they were so far overlooked by the Dawes Commission that the time limited by the act just mentioned expired without their being included in the enrollment.

The activities of Winton and associates for which recovery is asked date from this point. Soon after the passage of the Act of June 10, 1896, Messrs. Owen and Winton entered into an agreement under which the latter was to proceed to Mississippi and procure contracts with such Indians as might be entitled to participate in any distribution of lands or moneys of the Choctaw and Chickasaw Nations, arranging to secure evidence, powers of attorney, and contracts, as prescribed by Mr. Owen; Owen was to prepare the necessary forms and represent the claims of the Indians before the proper officers of the United States or Indian Governments, with the assistance and coöperation of Winton; Winton to receive one-half of the net proceeds of the contracts. A supplementary agreement between the same parties provided in terms that Owen should have a half interest in the contracts, and in the event of accident to Winton should take them up as attorney in Winton's place. Immediately thereafter Winton proceeded to Mississippi, and during the year 1896 and the years following procured approximately 1,000 contracts with full-blood Mississippi Choctaws, some in the name of Winton, some in the name of Owen, by the terms of which Winton and Owen agreed to use their best efforts to secure the rights of citizenship for said Mississippi Choctaws, as members of the Choctaw Nation, in the lands and funds of said tribe, for a fee of one-half the net interest of each allottee in any allotment thereafter secured. These contracts were subsequently abandoned by Owen and Winton because void and unenforceable under the Acts of June 28, 1898, and May 31, 1900, referred to below, and new contracts were thereafter taken, principally in the name of Charles S. Daley, but in behalf

of Owen and Winton,- with whom Daley was associated. These contracts recognized the previous services of Winton and associates as beneficial to the Indians, employed Daley and associates, including Winton and associates, as attorneys to look out for, protect, defend, and secure the interest of the Indians in the lands in Indian Territory to which they might be entitled as Mississippi Choctaws or as members of the Choctaw Nation, and to procure the recognition of their rights in said lands and in and to any funds arising from the Choctaw-Chickasaw lands, and provided that as compensation for all services rendered and to be rendered the attorneys should receive a sum of money equal to one-half of the value of the net recovery, based upon the actual value of the lands recovered. They seem to have contained other provisions looking to the sale or encumbrance, in part at least, of the lands secured for the Indians. The validity of these contracts has not been discussed.

Early in 1897 Mr. Owen spoke to Hon. John Sharp Williams, then Representative in Congress from the Fifth Congressional District of Mississippi, wherein practically all full-blood Mississippi Choctaws resided, calling his attention to the possible rights of such Choctaws to participate in the partition of the lands of the Choctaw Nation, at the same time submitting to him a copy of the Dancing Rabbit Creek Treaty, and calling his attention to Article 14. This was the first time the matter had been called to the attention of Mr. Williams. Thereafter, and until March 4, 1903, when he ceased to represent that District, he was active in all matters of legislation concerning the Mississippi Choctaws.

In December, 1896, Winton presented to Congress a memorial in behalf of Jack Amos and other full-blood Mississippi Choctaws asking that their rights under Article 14 of the Treaty of 1830 be accorded to them, and that they be provided for by enrollment either by the

Dawes Commission or by a special agent under the direction of the Commissioner of Indian Affairs. In January, 1897, a second memorial in behalf of Jack Amos and 246 other full-blood Mississippi Choctaws being heads of families was presented to Congress through Winton, asking that they be enrolled so as to participate in the proposed allotment of Choctaw lands in Indian Territory; and setting up that by the true construction of Article 14 of the Treaty of 1830, when viewed in connection with other treaties and laws and the history of the Choctaw Tribe, the Mississippi Choctaws were entitled to remain in Mississippi as United States citizens and still retain the rights of a Choctaw citizen, except as to a participation in the annuity.

In September, 1897, Winton presented a third memorial of like purport to the Secretary of the Interior.

Prior to the presentation of the first of these memorials, and in September or October, 1896, Mr. Owen appeared before the Dawes Commission in behalf of Jack Amos and 97 other full-blood Choctaws residing in Mississippi, and attempted to secure their enrollment under the Act of June 10, 1896. The Commission refused, on the ground that they were not resident in the Indian Territory. Owen appealed to the United States Court for the Central District of Indian Territory, where the ruling of the Commission was affirmed. This decision was "indirectly affirmed" by this court on May 15, 1899, in the case of *Stephens* v. *Cherokee Nation*, 174 U. S. 445, where it was held that the legislation under which the judgment was rendered was constitutional, and that this court was without jurisdiction to review decisions of the courts of Indian Territory in citizenship cases except upon the question of the constitutionality or validity of the legislation.

On February 11, 1897, a resolution drawn up by Mr. Owen was passed by the Senate, directing the Secretary

of the Interior to transmit certain historical data, and information respecting the rights of the Fourteenth Article claimants. This was referred by the Secretary to the Commissioner of Indian Affairs for reply, and his reply, containing material supporting the claims of the Mississippi Choctaws, was transmitted by the Secretary to the Senate, February 15, 1897 (Senate Doc. 129, 54th Cong., 2d sess.).

About the same time, Mr. Owen made an argument before the Committee on Indian Affairs of the House in support of House Bill No. 10,372, intended to permit the Mississippi Choctaws to continue to reside in that State and still claim the rights of Choctaw citizens. A favorable report was made by the Committee, March 3, 1897 (House Report 3,080, 54th Cong., 2d sess.), but the bill never passed either House.

In the Indian Appropriation Act of June 7, 1897, however, the following provision was contained: "That the commission appointed to negotiate with the Five Civilized Tribes in the Indian Territory shall examine and report to Congress whether the Mississippi Choctaws under their treaties are not entitled to all the rights of Choctaw citizenship except an interest in the Choctaw annuities" (c. 3, 30 Stat. 62, 83).

Following the passage of this act Mr. Owen appeared before the Dawes Commission in the interest of the Mississippi Choctaws with whom he had contracts. On January 28, 1898, the Commission made a report to Congress as required by the act last mentioned (House Doc. 274, 55th Cong., 2d sess.), setting forth in brief the history of the Mississippi Choctaws and their then present condition; and submitting an elaborate argument in opposition to the contention that those Choctaws might continue their residence and political status in Mississippi as in the past and still enjoy all the rights of Choctaw citizenship except to share in the Choctaw annuities;

declaring that in order to avail himself of the privileges of a Choctaw citizen, any person claiming to be a descendant of those provided for in Article 14 of the Treaty of 1830 "must first show the fact that he is such descendant, and has in good faith joined his brethren in the Territory with the intent to become one of the citizens of the Nation. Having done so, such person has a right to be enrolled as a Choctaw citizen and to claim all the privileges of such a citizen, except to a share in the annuities. And that otherwise he can not claim as a right the 'privilege of a Choctaw citizen.'" The Commission further said that, if they were correct in this, still any person presenting himself claiming the right must be required by some tribunal to prove the fact that he was a descendant of some one of those Indians who originally availed themselves of and conformed to the requirements of the Fourteenth Article of the Treaty of 1830. "The time for making application to this commission to be enrolled as a Choctaw citizen has expired. It would be necessary, therefore, to extend by law the time for persons claiming this right to make application and be heard by this commission, or to create a new tribunal for that purpose."

On June 28, 1898, Congress passed an act, commonly known as the Curtis Act, which contained in § 21 provisions for the making of rolls of the Five Civilized Tribes by the Dawes Commission, and among others the following: "Said commission shall have authority to determine the identity of Choctaw Indians claiming rights in the Choctaw lands under article fourteen of the treaty between the United States and the Choctaw Nation concluded September twenty-seventh, eighteen hundred and thirty, and to that end they may administer oaths, examine witnesses, and perform all other acts necessary thereto and make report to the Secretary of the Interior.

*    *    *    *    *    *    *    *.

"No person shall be enrolled who has not heretofore removed to and in good faith settled in the nation in which he claims citizenship: *Provided, however*, That nothing contained in this Act shall be so construed as to militate, against any rights or privileges which the Mississippi Choctaws may have under the laws of or the treaties with the United States." (C. 517, 30 Stat. 495, 503.)

Public notice having been given in Mississippi as to the times and places at which the Commission would hear applications for identification under the above provision, one of the Commissioners, A. S. McKennon, proceeded to Mississippi in January, 1899, with a force of clerks and stenographers and there identified and made up a schedule of 1923 persons as being Mississippi Choctaws entitled to citizenship in the Choctaw Nation under Article 14 of the treaty. The principle adopted was that proof of the fact that a claimant was a full-blood Indian whose ancestors were living in Mississippi at the date of the treaty was sufficient evidence to report his name as a Mississippi Choctaw under § 21 of the Curtis Act. This schedule, known as the "McKennon Roll," was subsequently approved by the Commission, who forwarded it with a report dated March 10, 1899, to the Secretary of the Interior. The schedule never was approved by the Secretary, and was attempted to be withdrawn by the Commission December 20, 1900, errors having been discovered in it. It was formally disapproved by the Secretary March 1, 1907. The Court of Claims finds that "the work of Commissioner McKennon, covering a period of about three weeks, in identifying and making up said schedule, was interfered with and retarded by said Charles F. Winton, who endeavored to prevent the Indians from appearing for identification." No explanation of this appears. At the same time it is found that Mr. Owen (who of course was associated with Winton) furnished to Commissioner McKennon a list

of 16,000 Choctaw Indians, which aided McKennon in
his official work.

Because of material errors discovered by the Commis-
sion in the McKennon roll, another party was organized
and sent out by the Commission for the purpose of
making a more accurate and complete roll of the Missis-
sippi Choctaws under the Act of 1898, whose hearings
were commenced in Mississippi in December, 1900, re-
sumed in April of the following year, and continued until
the latter part of August, 1901.

February 7, 1900, Winton and associates presented a
memorial to Congress praying that the treaty rights of
the Mississippi Choctaws be so construed as to afford
them the rights of Choctaw citizens without removal, or
that they be permitted to have those rights determined
in the courts. Congress took no action upon this.

April 4, 1900, Winton and his associates memorialized
Congress requesting the following amendment to the
Indian appropriation act then pending: "Provided, That
any Mississippi Choctaw duly identified and enrolled as
such by the United States Commission to the Five
Civilized Tribes shall have the right, at any time prior
to the approval of the final rolls of the Mississippi Choc-
taws by the Secretary of the Interior, to make settlement
within the Choctaw-Chickasaw country, and on proof
of the fact of bona fide settlement they shall be enrolled
by the Secretary of the Interior as Choctaws entitled to
allotment."

The act as passed contained the following: "*Provided*,
That any Mississippi Choctaw duly identified as such
by the United States Commission to the Five Civilized
Tribes shall have the right, at any time prior to the ap-
proval of the final rolls of the Choctaws and Chickasaws.
by the Secretary of the Interior, to make settlement
within the Choctaw-Chickasaw country, and on proof of
the fact of bona fide settlement may be enrolled by such

United States Commission and by the Secretary of the Interior as Choctaws entitled to allotment: *Provided further,* That all contracts or agreements looking to the sale or encumbrance in any way of the lands to be allotted to said Mississippi Choctaws shall be null and void." (Act of May 31, 1900, c. 598, 31 Stat. 221, 236–237.)

The Dawes Commission thereafter required from all applicants for enrollment proof of descent from Choctaw Indians who remained in Mississippi and received patents for lands under the Fourteenth Article of the Treaty of 1830. This constituted a reversal of the principle previously adopted in making the McKennon Roll, to wit, a presumption that the ancestors of full-blood Choctaws residing in Mississippi had fully complied with the requirements of Article 14. It resulted that only six or seven persons claiming as Mississippi Choctaws were enrolled under the Act of May 31, 1900, although from 6,000 to 8,000 applications were filed in 1900 and the early part of 1901.

On April 1, 1901, the second party, already mentioned, sent by the Dawes Commission to Mississippi for the purpose of making a complete and accurate roll of Mississippi Choctaws, resumed hearings at Meridian, Mississippi, and held continuous sessions there and at other places in the State until the latter part of August. The Court of Claims finds that during these hearings and the making of this roll the conduct of Winton and associates increased the work of enrollment and impeded its progress. Being advised by Owen and believing that the McKennon Roll was a finality and constituted a favorable judgment in behalf of the Choctaws whose names appeared therein, Winton and associates advised all Indians who had been previously enrolled not to appear again before the Commission for identification. Nevertheless, as already stated, 6,000 or 8,000 applications for enrollment were made, of which only six or seven were accepted under the stringent rule of proof adopted by the Commission.

June 20, 1901, Winton, under advice of counsel, began taking new contracts with individual Choctaws living in Mississippi, in lieu of the previous contracts already mentioned. The new contracts were 834 in number, and embraced in all about 2,000 persons.

March 21, 1902, while preparation of the identification roll of Mississippi Choctaws was still in progress, an agreement was entered into between the Choctaw and Chickasaw Nations and the Dawes Commission in which, by sections 41, 42, 43 and 44, it was proposed to fix the status of the Mississippi Choctaws. This agreement, after some amendments in Congress, was approved by Act of July 1, 1902, and ratified by the Choctaws and Chickasaws on September 25, 1902 (c. 1362, 32 Stat. 641, 651-652). It was under this agreement, known as the Choctaw-Chickasaw Supplemental Agreement, that practically all Mississippi Choctaws were enrolled and secured their rights to allotments of Choctaw tribal lands. Section 41 as signed by the parties did not contain the full-blood rule of evidence—that is, that full-blood Choctaws living in Mississippi should be presumed to be descendants of Choctaws who had complied with the requirements of Article 14 of the Treaty of 1830. It permitted all persons identified by the Commission under the provisions of § 21 of the Act of June 28, 1898, as Mississippi Choctaws entitled to benefits under Article 14 of the treaty to make *bona fide* settlement within the Choctaw-Chickasaw country at any time within six months after the date of the final ratification of the agreement, and upon proof of such settlement to the Commission within one year after the date of such ratification they were to be enrolled by the Commission as Mississippi Choctaws entitled to allotment; but declared: "The application of no person for identification as a Mississippi Choctaw shall be received by said Commission after the date of the final ratification of this agreement." While the supplemental agreement

as thus proposed was pending in the Senate, Winton and
associates presented a memorial to that. body in behalf
of the full-blood Mississippi Choctaws, ·reviewing prior
legislation and praying that the provisions of the agree- ·
ment then pending should be amended so that the full-
blood rule of evidence should be established and the
·Mississippi Choctaws given time after identification to
remove to the Choctaw country and longer time within
which to make application. (Senate Doc. 319, 57th
Cong., 1st sess.) . The memorial prayed that sections 41,
42, 43, and 44, which, it was alleged, imposed· onerous
conditions upon Mississippi Choctaws, should be struck ·
out and plain provision made that persons whose names
appeared upon the McKennon Roll, and such full-blood
Mississippi Choctaws as might be identified by the Com-
mission, and the wives, children, and grandchildren of
all such, should alone constitute the "Mississippi Choc-
taws " entitled to benefits under the agreement; and
that all of them who should have removed to the Choc-
taw-Chickasaw lands within twelve months after official
notification of their identification should be enrolled upon
a separate roll designated "Mississippi Choctaws" and
lands equal in value to lands allotted to citizens of the
Choctaw and Chickasaw tribes should be selected and
set apart for each of them, and that after a *bona fide* resi-
dence for a period of a year and proof thereof they should
receive patents as provided in the Atoka Agreement, and
be treated in all respects as other Choctaws.  An amend-
ment embodying these suggestions was introduced in the
Senate at Mr. Owen's request, submitted to the Depart-
ment of the Interior, and adversely reported upon.  Sec-
tion 41, however, was subsequently amended, and as
finally enacted (32 Stat. 651) established the full-blood
rule as a rule of evidence, allowed six months after date
of final ratification of the agreement within which appli-
cations for identification might be made, six months after

identification within which settlement might be made within the Choctaw-Chickasaw country, and one year after identification for making proof of such settlement to the Commission.

The passage of the Act of July 1, 1902, as thus amended, was opposed by Mr. Owen and the associates of Winton, who protested against the conditions contained in the amended sections relating to the Mississippi Choctaws as finally adopted.

The Indian Appropriation Act of March 3, 1903, c. 994, 32 Stat. 982, 997, contained the following: "That the sum of twenty thousand dollars, or so much thereof as is necessary, is hereby appropriated, to be immediately available, for the purpose of aiding indigent and identified full-blood Mississippi Choctaws to remove to the Indian Territory, to be expended at the discretion and under the direction of the Secretary of the Interior." The special disbursing agent of the Dawes Commission was sent to Mississippi to carry out this provision. He there organized parties and assembled all Indians who could be found and induced to come, and they were later transported by special trains to Indian Territory and there further maintained until placed upon allotments, and supplied with tools and other equipment and rations for six months, all at the expense of the United States. The total number thus transported, maintained, and equipped was 420.

The Dawes Commission received applications from approximately 25,000 persons for enrollment as Mississippi Choctaws. Of this number 2,534 were identified by the Commission; but of these 956 failed to remove to Indian Territory or submit proof of their removal and settlement within the time prescribed by law. The total number of applicants identified and finally enrolled and who have received allotments as members of the Choctaw Nation is 1,578, of whom only 833 appear on the McKennon Roll,

and only 696 had contracts with Winton and his associates; 181 Mississippi Choctaws had voluntarily removed to the Territory in 1889 and were received into the Choctaw Nation. These were carried on the rolls as Mississippi Choctaws, making the total enrollment 1,759; but the 181 Indians just mentioned were not regarded as defendants in this proceeding.

The funds derived from sales of allotted lands of enrolled Mississippi Choctaws subject to the restrictions upon alienation prescribed by § 1 of the Act of May 27, 1908, c. 199, 35 Stat. 312, are held by the Government to the credit of the individual Indians entitled thereto. All other funds belonging to enrolled Mississippi Choctaws are held as tribal funds, the names being carried on a separate roll.

As we construe the jurisdictional acts under which these claims were submitted to the Court of Claims, they contemplate not an action *in personam* to establish a personal liability against individual Indians, or a group of Indians, but a suit of an equitable nature against that class of Mississippi Choctaws who, through successful assertion of the right of citizenship in the Choctaw Nation, acquired allotments of lands in what formerly was the tribal domain, and a participation in funds held in trust by the United States; a suit having the object of imposing an equitable charge upon their funds and lands for a reasonable and proportionate contribution towards the value of services rendered and expenses incurred by the claimants in securing for said class of Indians a beneficial participation in the trust estate, according to the principle applied in *Trustees* v. *Greenough,* 105 U. S. 527, 532, *et. seq.,* and *Central Railroad & Banking Co.* v. *Pettus,* 113 U. S. 116, 122–127. The present suit is of that nature.

It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property.

The guardianship arises from their condition of tutelage
or dependency; and it rests with Congress to determine
when the relationship shall cease; the mere grant of rights
of citizenship not being sufficient to terminate it. *Lone
Wolf* v. *Hitchcock*, 187 U. S. 553, 564, *et seq.; Tiger* v.
*Western Investment Co.*, 221 U. S. 286, 310–316. In au-
thorizing the present suit Congress evidently recognized
that it was impracticable to bring before the court all
interested individual Choctaws; hence, treating them as
a class, it designated the representatives who should de-
fend for them, by analogy to the familiar practice in equity,
recognized in Equity Rule 38 (226 U. S. 659). To the
objection that the Government's trusteeship of the funds
of these Indians and its guardianship over their interests
in the allotted lands made it necessary that the United
States should be a party to the proceeding, it is sufficient
to say that the regulation of this matter is clearly within
the power of Congress, and that Congress acted within
that power in constituting the governor of the Choctaw
Nation the representative of the defendants upon whom
notice of the suit was to be served in their behalf, and
designating the Attorney General of the United States as
their attorney to appear and defend the suit. We are
clear, therefore, that there is no substantial basis for the
contention that the jurisdictional acts have the effect of
depriving the Indians of their property without due proc-
ess of law and hence are in conflict with the Fifth Amend-
ment; a contention which, while overruled by a majority
of the Court of Claims, was acceded to by the Chief Jus-
tice in a concurring opinion, 51 Ct. Clms. 324–327.

The claim of Winton, Owen, and associates, is based
wholly upon services rendered—nothing being asked be-
cause of expenses incurred or moneys disbursed. Accord-
ing to the findings the services rendered were in the nature
of professional services before Congress and its com-
mittees, individual Representatives and Senators, the

Dawes Commission, etc., intended to establish the right of the Mississippi Choctaws to participation in the material benefits of citizenship in the Choctaw Nation, and to secure such legislation by Congress as might be needed for the practical attainment of the object sought. The findings render it clear that services of this nature, altogether proper in character—not lobbying, in the odious sense— were rendered by these claimants under particular employment by many individual Mississippi Choctaws, but with the object, incidentally, of benefiting the Mississippi Choctaws as a class, because only so could the clients of the claimants be benefited. We make no doubt that, for proper professional services rendered and expenses incurred in promoting legislation that has for its object and effect the rescue of substantial property interests for a class of beneficiaries under a trust of a public nature, it is equitable to impose a charge for reimbursement and compensation upon the interests of those beneficiaries who receive the benefit, the same as if a like result had been reached through successful litigation in the courts. In either case there is the same curious analogy to the salvage services of the maritime law; and while it may be more difficult to weigh the effect of a service rendered in promoting legislation and to estimate its value than in a case of successful litigation, we think the principle of *Trustees* v. *Greenough* and *Central Railroad & Banking Co.* v. *Pettus* applies in the one case as in the other.

The fact that in the present case the services were rendered under contracts with particular Indians, whether valid or invalid, is no obstacle to a recovery. Services not gratuitous, and neither *mala in se* nor *mala prohibita*, rendered under a contract that is invalid or unenforceable, may furnish a basis for an implied or constructive contract to pay their reasonable value. *King* v. *Brown*, 2 Hill (N. Y.) 485, 487; *Erben* v. *Lorillard*, 19 N. Y. 299, 302; *Smith* v. *Administrators of Smith*, 28 N. J. L. 208, 218;

*McElroy* v. *Ludlum*, 32 N. J. Eq. 828, 833; *Gay* v. *Mooney*,
67 N. J. L. 27, 687; *New York Central & Hudson River
R. R. Co.* v. *Gray*, 161 App. Div. (N. Y.) 924, 932; affirmed
239 U. S. 583, 587.

And assuming the last set of contracts made by Winton
and Owen with the Mississippi Choctaws (including the
Daley contracts) be regarded as valid, they still do not
create an obstacle to the present suit. As between the
claimants and their own clients, the existence of valid
express contracts would bar recovery upon an implied con-
tract. But there was no privity between claimants and
the Mississippi Choctaws as a class, no contract having
been made with them in their aggregate capacity and the
individual contracts not including all members of the
class. Under the equitable doctrine that we hold ap-
plicable, claimants, having substantially performed the
agreements, might demand compensation under them as
against their own clients, and the latter would then be en-
titled to a ratable contribution upon the basis of a *quantum
meruit* from their fellow beneficiaries whose interests in the
trust estate were secured and rendered available through
the services of claimants. And by way of avoiding circuity
of action the equitable proceeding may well be brought, as
it has been brought, by claimants directly against the
beneficiaries of the trust; claimants waiving, as they must,
any right to recover under the contracts the measure of
compensation prescribed therein. Hence, whether valid or
invalid, the contracts are important merely as they show
that claimants were not intermeddlers but were employed
by large numbers of Mississippi Choctaws, members of the
benefited class, and that their services were not intended
to be gratuitous.

But, in order that there may be an equitable charge in
such a case, it is essential that the services rendered shall
have been substantially instrumental in producing a result
beneficial to the class of *cestuis que trustent* upon whose

interests the charge is to be imposed. And while from the facts found it is altogether probable that the services of Winton and associates did materially conduce to bring about a result beneficial to the Mississippi Choctaws by furthering the measures of legislation and administration that were needed to give them a participation in the lands and funds of the Choctaw Nation, there is no specific finding of fact upon that subject. If, from the circumstantial facts as found, it followed as a necessary inference that the services did materially contribute to produce the effect indicated, it might be held that the ultimate fact resulted as a conclusion of law. See *United States* v. *Pugh*, 99 U. S. 265, 269–272. But the facts as found are inconclusive respecting the crucial point. Some of the services set forth in the findings clearly tended to produce a beneficial result; but there were others having apparently a contrary tendency. The interference by Winton with the work of Commissioner McKennon in making up his roll, and with the work of the second party in making identifications; the insistence before Congress upon measures for granting to the Mississippi Choctaws the rights of citizenship in the Nation while retaining their residence in Mississippi; and the opposition to the passage of the Act of July 1, 1902, in its final form, may be mentioned. However reasonable and well-intended these acts on the part of the claimants may have been—attributable as probably they were to zeal in the interests of the Indians—it cannot be said to be free from doubt that the efforts of claimants, taken as a whole, advanced the claims of the Mississippi Choctaws as a class to citizenship in the Nation and constituted a material factor in producing the ultimate advantageous result.

But there were requests for additional findings, directed to the very point upon which findings are wanting. These requests were preferred under Rules 90–95, but were filed more than the prescribed sixty days after judgment. The

court in its discretion might have rejected them on this ground. Not doing this, however, it passed upon the merits of the requests, as was reasonable in a case so important and so complicated; and since, from the reasons given for rejecting them, it appears that the court to some extent misapprehended the nature of the main issue, and the bearing of the requested findings thereon, it cannot be said that had it not done so it would have rejected the requests because not filed in due season.

Many of the requests, while suggestive of matters that might well have been included in the findings, either are not framed with sufficient definiteness to enable us to say that there was error in rejecting them, or are objectionable for other reasons. But those here stated ought to have been acceded to:

· XXIX-R (52 Ct. Clms. 128). "Whether or not the labor of Robert L. Owen in behalf of the rights of the Mississippi Choctaws to citizenship in the Choctaw Nation, from July, 1896, to 1906, resulted in any benefit or value whatever to the Mississippi Choctaws."

XXXI-E (52 Ct. Clms. 130). "Whether or not the 1,643 Mississippi Choctaws who were admitted to citizenship in and received allotments as members of the Choctaw Nation obtained the right to become such citizens and thereby receive allotments as a result to any extent whatever of any of the labor and work done by Robert L. Owen and associates during the period of several years prior to the passage of the acts under which they were enrolled and allotted; and what compensation is equitable or justly due therefor on the principle of *quantum meruit* as required by the jurisdictional act in this case." ·

The reasons given for the rejection of these requests are not satisfactory; and for failure to make findings in response thereto, the judgment in the case of Winton and associates, No. 6, must be reversed, and the cause remanded for additional findings as requested.

The claim in No. 12, Katie A. Howe, executrix of Chester Howe, deceased, like the one we have been discussing, is based upon alleged legal services rendered before Congress and the Interior Department in representing and protecting the interests of the Mississippi Choctaws and establishing their rights in and to lands in the Choctaw Nation. The findings show that Chester Howe, having acquired an interest in a large number of contracts taken by a firm of Hudson & Arnold, or the members of the firm, with individual Mississippi Choctaw claimants, having the object of securing the rights of the latter to allotments in the tribal lands of the Choctaw Nation and removing the Indians to the Indian Territory, was actively engaged for about a year and a half in pressing the claims of those Choctaws upon Congressmen and Senators, the Sub-Committee on Indian Affairs of the House of Representatives, the officials of the Indian Office, and the Secretary of the Interior. It is found not to have been established by the evidence that Howe's services were effective in establishing the claims of the Mississippi Choctaws to citizenship in the Choctaw Nation, or that such legislation as was enacted, under which they received allotments in the tribal lands, was the result of his professional services. The vital element of a benefit conferred upon the Mississippi Choctaws as a class is lacking, and from what we have said it is manifest that the judgment of the Court of Claims as to this claim must be affirmed.

In the other cases covered by the present appeals, viz., Bounds, No. 7, London, No. 8, Field and Lindly, No. 9, Beckham, No. 10, and Vernon, No. 11, the findings show no benefit conferred upon the Mississippi Choctaws as a class for which recovery can be had under the jurisdictional acts. The claims of Bounds, Beckham, and Vernon are based upon services rendered and expenses incurred in behalf of individual Indians. London did nothing to advance the claims of the Mississippi Choctaws to citizen-

ship in the Nation.' Lindly and Field claim as associates of Chester Howe; it does not appear that Lindly performed any meritorious service for the Indians; Field was active in impressing upon Congressmen and Senators his views as to necessary and proper legislation for securing the rights of the Mississippi Choctaws to citizenship in the Choctaw Nation; but the extent and effect of such services do not appear, nor does it appear that the legislation finally enacted was the result of said services. In none of these cases does the record show any proper foundation laid for a remand for further findings. All these claims were properly rejected.

*No. 6. Judgment reversed, and the cause remanded for further findings of fact as above specified.*

*Nos. 7, 8, 9, 10, 11, and 12. Judgments affirmed.*

MR. JUSTICE VAN DEVANTER and MR. JUSTICE MC-REYNOLDS took no part in the consideration or decision of these cases.