**Ben YANITO and Seth Bigman, Plaintiffs,**

v.

**Clytie BARBER, individually and in her capacity as County Clerk of San Juan County, Utah, Defendant.**

**Civ. No. C 220–72.**

United States District Court, D. Utah, C. D.

Sept. 20, 1972.

---

Thomas E. Luebben, Jr., Native American Legal Defense and Education Fund, Albuquerque, N. M., and Richard W. Hughes, Shiprock, New Mexico, for plaintiffs.

Vernon B. Romney, Atty. Gen., State of Utah, and Frank V. Nelson, Asst. Atty. Gen., Salt Lake City, Utah, for defendant.

Before DOYLE, Circuit Judge, RITTER, Chief District Judge, and ANDERSON, District Judge.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, Circuit Judge.

In this action plaintiffs, Navajo Indians, seek recovery for alleged violation of their civil rights. They have invoked 28 U.S.C. §§ 1331 and 1343(3) and 42 U.S.C. § 1983.

Pursuant to 28 U.S.C. §§ 2281 and 2284 et seq. a three-judge district court has been convened. The matter has been heard, including the presentation of evidence, and the cause now stands submitted.

The plaintiffs reside at Bluff, Utah in San Juan County. About two weeks before the May 10 deadline for filing as independent candidates, plaintiffs sought the aid of one Jack Hennessey, who is engaged in social and educational work among the Navajo Indians in San Juan County. Hennessey called defendant Barber on behalf of the plaintiffs and inquired, first, as to whether there were any county offices which were subject to election at the upcoming November election and was informed that there were two County Commissioner offices

in contention. Hennessey then inquired as to the procedure to be followed in order to get on the ballot as independent candidates and was told that it was necessary to come into the office of the County Clerk, fill out the declaration form and pay the requisite fee. Hennessey communicated this to the plaintiffs and also told them that the filing had to be completed on May 10, 1972. On that date plaintiffs went to the Clerk's Office, filled out the forms and paid the required amounts, $30.00 for the two-year term and $60.00 for the four-year term. Defendant accepted their declarations and their filing fees and they departed. The evidence showed that they believed that these acts satisfied the demands of law.

Mrs. Barber made no mention that there was a further requisite: that there had to be filed in addition a petition signed by 50 electors of the district; this was an absolute requisite set forth in the Utah statute here in question, U.C. § 20–7–1.

Immediately after the filing of the declarations and the payment of the fees, defendant was shown to have gone to the office of the County Attorney and informed him that the declarations had been filed, but that the plaintiffs had failed to comply with the mandate of the statute regarding the petition of nomination containing 50 notarized signatures. The County Attorney recognized the problem, for he immediately conveyed this information to plaintiffs. Upon being advised of this additional requirement, plaintiffs proceded to obtain the signatures, but filed the document with the signatures some five days late. Moreover, plaintiffs had not been told that the signatures had to be notarized and, so they were advised of the deficiencies and they thereupon brought this suit.

In the complaint they allege that they were misled by the County Clerk, and they also point up the great difficulty, if not impossibility, of obtaining notarized signatures in San Juan County.

The evidence establishes that San Juan County has a tremendous area. It is said to be the second largest county area-wise in the United States. It is adjacent to the San Juan River in Southern Utah and extends to the Arizona border. The plaintiffs live some 60 miles from the County Seat and the 4,000 Indian inhabitants of the County live in far-flung rural areas. According to the evidence, there are few notaries public. The court was told about three such officials, although there may be more. In any event, the barriers to getting on the ballot in this manner and in thus satisfying the requirement of the statute are great. To obtain 50 notarized signatures, according to the testimony, would require a good deal of time and would entail great expense since the notary public would have to travel to these distant places. The evidence also showed that the plaintiffs were seeking the offices in order to improve the roads in the County, which, despite its size, has minimal paved highways. This not only makes travel and communication difficult; it renders it impossible in inclement weather. It also prevents transporting the children to school when the roads are muddy. Thus, the evidence shows that these plaintiffs in offering themselves as candidates were seeking to aid the plight of their people.

Plaintiffs' contention is that the mentioned Utah statute is unconstitutional on its face because it imposes arbitrary and unreasonable barriers to the participation in the election process. They also contend that there is unreasonable discrimination against them.

We determine that the court has jurisdiction of the cause pursuant to 42 U.S. C. § 1983. See McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); see also Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) and see Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

The question presented is peculiarly a federal one in which plaintiffs are suing for violation of civil rights; there is no plain, speedy and adequate remedy under state law and time is of the essence in this matter, and so there is no federal jurisdiction problem.

Although the plaintiffs seek an adjudication that the statute is, on its face, unconstitutional, we conclude that it is unnecessary to go to this length in order to grant the relief which the plaintiffs seek. There is ample evidence that the statute as applied and administered places an unconstitutional burden on these plaintiffs, and because of this they are entitled to the relief for which they pray, namely, an injunction against the defendant enjoining her from refusing or failing to certify the plaintiffs as qualified independent candidates for County Commissioner of San Juan County and from refusing to place the names on the general election ballot for said office.

In order to evaluate the plaintiffs' allegation that they have been denied free exercise of their political rights and have been deprived of due process and equal protection of the law as guaranteed by the Fourteenth Amendment, it is necessary not only to consider the facts very briefly outlined above, but also the peculiar and special relationships of the Indian to his governments, local, state and federal. The story of this is well and generally known, but it will bear some brief repetition.

Prior to 1924 the Indian was not a citizen of the United States, and he enjoyed none of the rights of citizens. He had a special legal status derived from treaties with tribes as special internal nations and as a result of federal legislation, most all of which proceeded on the basis that the Indian had the status of ward. This doctrine was first recognized by the Supreme Court in Cherokee Nation v. State of Georgia, 30 U.S. 1, 5 Pet. 1, 8 L.Ed. 25 (1831). The Court through Chief Justice Marshall described the status of Indians under federal law:

> Their relation to the United States resembles that of a ward to his guardian.
>
> They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the President as their great father.

Cherokee Nation v. State of Georgia, supra, at 17, 8 L.Ed. 25.

Under this doctrine the Federal Government had almost unlimited power to regulate Indian affairs, and state interference with the exercise of this power was prohibited.[1]

The history of the Navajo tribe is not different from that of other tribes. A brief history is set forth in the Supreme Court's opinion in Williams v. Lee, 358 U.S. 217, 221, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

As noted, it was not until 1924 that Congress passed an Act granting citizenship to all non-citizen Indians. 8 U.S.C. § 1401 (1970) (43 Stat. 253, Act of June 2, 1924, Ch. 233). This statute, however, did not remove the restrictions imposed by state law, and in many states the Indians were excluded by statute from voting.[2] And in some states In-

---

1. Worcester v. State of Georgia, 31 U.S. (6 Pet.) 515 (1832), 8 L.Ed. 483, and Winton v. Amos, 255 U.S. 373, 41 S.Ct. 342, 65 L.Ed. 684 (1921):

    It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property. The guardianship arises from their condition of tutelage or dependency; and it rests with Congress to determine when the relationship shall cease; the mere grant of rights of citizenship not being sufficient to terminate it.
    255 U.S. at 391–392, 41 S.Ct. at 349.

2. See Houghton, The Legal Status of Indian Suffrage in the United States, 19 Cal.L.Rev. 507 (1931).

dians were barred from holding public office.[3]

In Utah, as in some other states, there was a statutory provision which was construed to prohibit Indians from voting.[4] In a case filed in 1956 the validity of the Utah statute was questioned. However, the Utah Supreme Court upheld it as reasonable based on the long history of not having voted nor participated in government, and in view of the dependent status of the Indians and their primitive way of life. See Allen v. Merrell, 6 Utah 2d 32, 305 P.2d 490 (1956). Certiorari was granted by the United States Supreme Court, 352 U.S. 889, 77 S.Ct. 134, 1 L.Ed.2d 85 (1956). However, this action was later dismissed as moot, and this was apparently due to the repeal of the statute. See Rothfels v. Southworth, 11 Utah 2d 169, 356 P.2d 612, 613 (1960).

The lessons which this history teach are that there has been a history of intentional discrimination, first, on the part of the Federal Government and, in more recent times, on the part of the state, growing out of the exercise by both the federal and state governments of authority over them and their complete dependency upon the government and government officials for recognition of their rights. This renders charged infringement of rights subject to close scrutiny so that not only the blatant infringement on the part of the state can be invalidated, but so also the more subtle mode of discrimination can be dis-

covered. This principle was recognized by the Supreme Court speaking through Mr. Justice Frankfurter in Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). There, in considering an Oklahoma statute, the effect of which was to disenfranchise Negro voters, it was said:

> The Amendment nullifies sophisticated as well as simpleminded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race.

307 U.S. at 276, 59 S.Ct. at 876.

Although the Court was speaking of the Fifteenth Amendment, the language is fully applicable to a possible violation of the Fourteenth Amendment. The Court also pointed out that the statute had to be judged in the light of the political habits and traditions of the group involved. The words of the writer of the opinion are fully applicable to the plaintiffs here:

> We believe that the opportunity thus given negro voters to free themselves from the effects of discrimination to which they should never have been subjected was too cabined and confined. The restrictions imposed must be judged with reference to those for whom they were designed. It must be remembered that we are dealing with a body of citizens lacking the habits

3. The fact that one is an Indian is not, generally speaking, a disqualification for public office. Exclusionary statutes based on race are probably unconstitutional. General Parker, a Seneca Indian, was qualified, according to an opinion of the Attorney General of the United States, to hold the office of the Commissioner of Indian Affairs.

Many early statutes disqualified noncitizen Indians from holding public offices by limiting incumbents to citizens of the United States or to whites. After the Civil War, the acts admitting the Confederate states to the Union prohibited the exclusion of elected officials because of race, color, or previous condition of servitude. These acts were implemented by the Act of April

20, 1871. A number of Indians were elected as delegates to the Constitutional Convention of the Territory of Oklahoma. Nevertheless, even now a few states still bar Indians from public office, by provisions which are probably unconstitutional. Idaho prohibits from holding any civil office Indians not taxed who have not severed their tribal relations and adopted the habits of civilization. The law of South Dakota excludes Indians "while maintaining tribal relations."

Cohen, Handbook of Federal Indian Law, 159 (1942).

4. See Allen, Denial of Voting Rights to Reservation Indians, 5 Utah L.Rev. 247 (1956).

and traditions of political independence and otherwise living in circumstances which do not encourage initiative and enterprise.

Lane v. Wilson, *supra*, at 276, 59 S.Ct. at 876.

■ As noted above, it is not necessary to consider the statute's validity on its face since there are not any palpable deficiencies, but this does not end the inquiry, for a statute valid on its face may be administered in an unconstitutional manner.[5] And so the conduct of the state acting through its officer must be appraised in the light of how the statute was used, and if it appears that it was operated in a discriminatory manner the resultant state action violates the Fourteenth Amendment regardless of the statute's being fair and rational.[6]

■ The threat to violation of constitutional rights is equally grave in the case of maladministration of the law as it is in the case of a statute which is unconstitutional on its face. The right which is infringed is not unimportant. It is the right to seek political office and to obtain majority support for his views—a substantial right of a citizen. Also, there is present the principle that the Constitution will not tolerate any preferred class of voters. See Gray v. Sanders, 372 U.S. 368, 380, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

In Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), it was contended that the State Canvassing Board failed to file a correct certificate, whereby the petitioner, a Republican nominee, was deprived of his right to be a candidate. The Court in that case recognized that the law may be administered so as to mistreat one class of citizens while preferring another.[7]

The statute in the case at bar, § 20–3–38 U.C.A.1953, makes provision for an independent candidate filing. It is clear in its requirement that a certificate of nomination must be signed by at least 50 voters of the county. It goes further and requires that

> [e]ach voter signing a certificate shall add to his signature his place of residence and shall, before any officer duly authorized to administer the same, make oath by affidavit thereto attached that he is a voter within and for the political division for which such nomination is made and has truly stated his residence.

The statute finally declares:

> This section shall be liberally construed so as to give independent candidates for public office every reasonable opportunity to make their candidacy effective.

We are moved in this case to grant the relief demanded because the evidence clearly establishes that the plaintiffs were unfairly treated and that in view of their dependent status the unfairness assumed gross proportions. The evidence established that numerous inquiries were made prior to the crucial date,

---

5. Williams v. Illinois, 399 U.S. 235, 242, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970).

6. Alabama State Federation of Labor v. Mc Adory, 325 U.S. 450, 462, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); Concordia Fire Ins. Co. v. Illinois, 292 U.S. 535, 54 S.Ct. 830, 78 L.Ed. 1411 (1934); Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 289, 42 S.Ct. 106, 66 L.Ed. 239 (1921); Field v. Clark, 143 U.S. 649, 694–697, 12 S.Ct. 495, 36 L.Ed. 294 (1892).

7. The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination. This may appear on the face of the action taken with respect to a particular class or person, cf. McFarland v. American Sugar Refining Co., 241 U.S. 79, 86, 87, 36 S.Ct. 498, 501, 60 L.Ed. 899, or it may only be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself, Yick Wo v. Hopkins, 118 U.S. 356, 373, 374, 6 S.Ct. 1064, 1072, 1073, 30 L.Ed. 220. 321 U.S. at 8, 64 S.Ct. at 401. In that case the Court did not find that there was a denial of constitutional rights.

May 10, 1972. In fact, defendant testified that there were a number of telephone calls. It is undisputed that no mention was ever made of any nominating petition. Indeed, no mention was made of this on the date of the filing. Defendant was asked at trial why she did not inform plaintiffs of this. Her response was that she did not consider it her duty to advise them of the legal requirements. At the same time, she did advise them of the necessity for filing a declaration and a filing fee, and she accepted their money. Thus, she showed some inclination to advise them, and the impression was conveyed that the action of the plaintiffs in filing their declaration and paying the fees fulfilled the demands of the statute.

Considering the dependent status of the plaintiffs—their inferior knowledge and defendant's superior knowledge, and in view of her awareness that they were accepting her advice—it was incumbent on defendant to at least mention the necessity for filing the nominating petition with the names of the electors. To fail to do so constitutes a crucial misstatement. Moreover, it must be inferred that this was knowingly and purposely carried out. There is no other permissible inference to be drawn from the communication of half truths or silence where there is an obligation to speak out.

This is not unlike the decision rendered by the Court of Appeals for the Tenth Circuit in United States v. Burns, 431 F.2d 1070 (10 Cir., 1970). There it was held that the defendant's constitutional rights were violated when the potential draftee sought advice of the Secretary of the Draft Board as to his rights as a non-believer in war. The testimony was that she asked him what his religion was, and when he responded that he was a Catholic she led him to believe that no recourse was open to him as a conscientious objector. The holding in an opinion written by Judge Phillips was that the advice and the failure to advise misled the registrant so that his conviction was held to be void and was reversed.[8]

Similarly, in our case, the defendant was under a duty to reveal all of the facts, not just part of them. Accordingly, it is our conclusion that it was unquestionably due to lack of advice that their final nominating petition continued to be insufficient. Nevertheless, the purpose of the statute was fulfilled in that plaintiffs, as independents, produced evidence of the required support. We consider the case to be an appealing one in which the equities favor the plaintiffs and are against the defendant. A Federal District Court would be remiss in its duty if it turned its back on a petition such as the present one. It is our conclusion that the plaintiffs' constitutional rights, as guaranteed by the Fourteenth Amendment, were violated in that there was a deprivation of not only substantial due process, but that there was an unlawful discrimination against the plaintiffs and the group which they represented. In closing, we emphasize that while the defendant was the main actor in this transaction, the viewpoint evidenced would appear to be a pervasive one.

Defendant is enjoined from refusing or failing to certify the plaintiffs as qualified, independent candidates for County Commissioner of San Juan County and from refusing to place these names on the general election ballot for said office. She is directed to certify the plaintiffs as independent candidates,

---

8. The court said:
   We are of the opinion that had not the Executive Secretary given Burns the erroneous advice, and had she given him SSS Form No. 150, he would have completed it and set forth therein that he was conscientiously opposed to serving directly or indirectly in combatant training and service in the armed forces of the United States, because of his beliefs, to which he testified at his trial; and that if the Local Board was convinced of his sincerity as to his asserted beliefs, it would have granted him an exemption and would have reclassified him accordingly.
   431 F.2d at 1074.

**594**

and she is further directed to place their names on the general election ballot for the offices of County Commissioner for the long term and the short term, in accordance with their filings.