**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Smith JOHN and Harry Smith John, Defendants-Appellants.**

**No. 76–1518.**

United States Court of Appeals, Fifth Circuit.

Oct. 11, 1977.

---

Edwin R. Smith, Philadelphia, Miss. (Court-appointed), for defendants-appellants.

Robert E. Hauberg, U. S. Atty., Daniel E. Lynn, Asst. U. S. Atty., Jackson, Miss., Larry G. Gutterridge, Peter R. Taft, Asst. Atty. Gen., Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before COLEMAN, GODBOLD and HILL, Circuit Judges.

COLEMAN, Circuit Judge.

Smith John and his son, Harry Smith John, are Mississippi residents, of Choctaw Indian blood. In the District Court for the Southern District of Mississippi they were indicted for the commission of a felonious assault, with intent to kill, upon one Artis Jenkins, in violation of 18 U.S.C. §§ 1153 and 113(a). The indictment charged that the defendants were Indians, that the offense was committed in the Northeast Quarter of Section 35, Township 11 North, Range 7 East, Leake County, Mississippi, on the Choctaw Indian Reservation, *on land within the Indian country* and under the jurisdiction of the United States.

At trial, the defendants requested an instruction on simple assault, to which there was no objection. They were convicted of that offense and were sentenced accordingly. This appeal followed.

■ Before the appeal could be heard these appellants served their 90 day jail sentences and discharged their fines. This suggests that there no longer exists any live case or controversy between these appellants and the United States, that this case is moot and should not be decided here. Were it not for the decision of the Supreme Court in *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), we would be inclined to so hold. Any possible collateral consequence of these convictions could occur only if the appellants should hereafter be called as witnesses in some criminal prosecution in a state court.[1] Under Mississippi law a witness may be impeached by proof of misdemeanor convic-

---

1. The convictions could not be used for impeachment in federal prosecutions, Rule of Evidence 609.

tions, *Lewis v. State*, 1904, 85 Miss. 35, 37 So. 497; *Breland v. State*, 1954, 221 Miss. 371, 73 So.2d 267. However, the witness may be asked only as to convictions; not the details of the crime. *Allison v. State*, Miss.1973, 274 So.2d 678; *Murray v. State*, Miss.1972, 266 So.2d 139; *Mangrum v. State*, Miss.1970, 232 So.2d 703. "Simple assault" includes incidents which amount to nothing more than fisticuffs and if the jury is not allowed to hear the details a conviction on that score could not have much impact on credibility; nevertheless, under *Sibron* we do not feel free to dismiss for mootness.

After their federal convictions, Smith John and Harry Smith John were indicted in the Circuit Court of Leake County, Mississippi, for an aggravated assault on Jenkins, were convicted, and sentenced to serve two years in the state penitentiary, with credit for time spent in jail awaiting trial.

On appeal the State Supreme Court held that the United States District Court did not have jurisdiction to try the defendants under the Major Crimes Act, 18 U.S.C. § 1153, and the State Court convictions were affirmed, *John v. State of Mississippi* (Miss.1977), 347 So.2d 959. See also, *Tubby v. State*, Miss.1976, 327 So.2d 272.

Our Court deferred decision on the instant appeal pending an application of the Solicitor General of the United States for a writ of certiorari in *United States v. State Tax Commission of the State of Mississippi*, 5 Cir. 1974, 505 F.2d 633, *reh. denied*, 535 F.2d 300 (1976), *reh. en banc denied*, 541 F.2d 469 (1976). In that case, which was not a criminal prosecution under 18 U.S.C. § 1153, we held that *the jurisdiction of the State of Mississippi over its citizens of Choctaw Indian blood stands unimpaired*. On April 5, 1977, we were notified that the

Acting Solicitor General had decided not to seek certiorari. He felt that the Court had incorrectly concluded that the Mississippi Choctaws are not a tribe but that this was unnecessary to the Court's resolution of the State Tax Commission controversy.

I

Jurisdiction

The threshold issue in this appeal is one of jurisdiction: did the assault on Jenkins take place "in Indian Country"?[2]

█ 18 U.S.C. § 1151, a product of the general revision of 1948, says that "Indian Country" shall include "all lands within the limits of any Indian Reservation under the jurisdiction of the United States government". The requirement is two-fold. The land must be within an Indian Reservation and the Indian Reservation must be under the jurisdiction of the United States government.

The quarter section of land, one half mile square, on which Jenkins was assaulted cannot be an Indian Reservation under the jurisdiction of the United States, and thus in "Indian Country", unless this was the kind of reservation to which Congress intended that § 1151 should apply—and only then if it was under the jurisdiction of the United States government by virtue of a Proclamation of the Acting Secretary of the Interior, dated December 4, 1944, purporting to act under the authority of § 7 of the Indian Reorganization Act of June 18, 1934, 48 Stat. 984.

█ We hold that the lands occupied in Mississippi by its citizens of Choctaw Indian blood *are not* in Indian Country; therefore,

---

**2.** 18 U.S.C., § 1151. Indian country defined

Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent

Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. June 25, 1948, c. 645, 62 Stat. 757; May 24, 1949, c. 139, § 25, 63 Stat. 94.

18 U.S.C. § 1153 [3] did not confer subject matter jurisdiction on the District Court.

The convictions are reversed and the cause remanded, with directions to set aside the convictions and dismiss the indictment.

## II

By the Enactment of 18 U.S.C., § 1151, Congress Specifically Sought to Avoid the Confusion of Checkerboard Jurisdiction, *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962).

On December 4, 1944, the Assistant Secretary of the Interior signed a proclamation [Federal Register, December 23, 1944, page 14,907] declaring that the Indian trust lands composed of many comparatively small, non-contiguous tracts in the Mississippi Counties of Attala, Jones, Leake, Neshoba, Newton, and Scott are "an Indian reservation for the benefit of those members of the Mississippi band of Choctaw Indians, of one-half or more Indian blood, resident in Mississippi, and enrolled at the Choctaw Indian Agency as aforesaid".

The 1944 Proclamation of the Assistant Secretary will be annexed to this opinion. It will be noted that the land descriptions there set forth are filled with indefinite descriptions, such as "less 10.4 acres off the northeast part thereof", "5 acres off the east end thereof", "less 14 acres on the East side", "less 10 acres in the southwest corner", and these indefinite descriptions bristle throughout the entire description of the "reservation" which the Assistant Secretary was attempting to establish. Moreover, a comparison of sections, townships, and ranges clearly indicate that in numerous instances, even within the same county, there were not contiguous parcels of land and, in the entirety, they were scattered over several counties.

The situation is pointed up by the fact that the indictment in this case had to specify that the alleged offense occurred on a particular quarter section of land in Leake County, the Northeast ¼ of Section 35, Township 11 North, Range 7 East, an area 880 yards square.

We have not attempted to map, county by county, the lands described in the Secretary's proclamation, section by section, township by township, and range by range. We do have before us the government's Supplemental Exhibit Number 3 filed in the case of *United States v. State Tax Commission, supra*, purporting to be a map of Indian reservation land in the Counties of Leake, Newton, Neshoba, and Kemper.

The map shows the "Red Water" and "Standing Pine" Indian Reservations in Leake County; the "Connehatta" Reservation in Newton County; the "Pearl River" and "Tucker" Reservations in Neshoba County; and the "Bogue Chitto" Indian Reservation in Kemper County.

The Red Water Reservation is composed of seven non-contiguous tracts; the Stand-

---

**3.** 18 U.S.C., § 1153. Offenses committed within Indian country.

Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to kill, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

As used in this section, the offenses of rape and assault with intent to commit rape shall be defined in accordance with the laws of the State in which the offense was committed, and any Indian who commits the offenses of rape or assault with intent to commit rape upon any female Indian within the Indian country shall be imprisoned at the discretion of the court.

As used in this section, the offenses of burglary, assault with a dangerous weapon, assault resulting in serious bodily injury, and incest shall be defined and punished in accordance with the laws of the State in which such offense was committed. (June 25, 1948, ch. 645, 62 Stat. 758; May 24, 1949, ch. 139, § 26, 63 Stat. 94; Nov. 2, 1966, Pub.L. 89–707, § 1, 80 Stat. 1100; Apr. 11, 1968, Pub.L. 90–284, title V, § 501, 82 Stat. 80.)

(Statute which was in effect on August 30, 1975, the date of the alleged offense.)

ing Pine Reservation is composed of five non-contiguous tracts; the Connehatta Reservation is composed of what appears to be nine non-contiguous tracts; the Pearl River Reservation seems to be composed of several non-contiguous tracts, the actual boundaries of which we cannot discern from the map; and the Bogue Chitto Indian Reservation is composed of at least four non-contiguous tracts. These five Reservations are dispersed over an area encompassing twelve hundred square miles in four counties.

In 1961, in an opinion by Mr. Justice Black, the Supreme Court held that by the enactment of 18 U.S.C., § 1151, Congress sought to avoid the confusion which would be caused by an impractical pattern of checkerboard jurisdiction which would require law enforcement officers in the area to search tract books to determine whether criminal jurisdiction over a particular offense did or did not exist, *Seymour v. Superintendent,* 1961, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346.

An examination of the land descriptions set forth in the Proclamation of the Assistant Secretary (annexed hereto) reveals that he did, in fact, proclaim an impractical checkerboard, exactly the kind which Congress sought to avoid when it enacted the revised 1948 statute defining "Indian Country".

This checkerboard was in existence, but it was not Indian Country, when Congress passed the 1948 revised statute. Since this widely dispersed disarray of small subdivisions of land, scattered in clusters throughout several Mississippi counties, was already in existence in 1948 and Congress sought to avoid just such a situation when it enacted 18 U.S.C., § 1151, defining Indian Country, it is apparent that by the enactment of the statute Congress could not have intended it to apply to the Choctaw Indian "reservation" in Mississippi. Congress could not have had any idea that it was converting a conglomeration of such tracts into "Indian Country".

We accordingly hold that the definition in the statute does not put these lands in Indian Country.

## III

"[M]embers of Tribes whose official status has been terminated by congressional enactment are no longer subject, by virtue of their status, to federal criminal jurisdiction under the Major Crimes Act."

*United States v. Antelope,* 1977, 430 U.S. 641, 97 S.Ct. 1395, 1399, 51 L.Ed.2d 701 (Footnote 7).

### A

## THE TERMINATION OF THE CHOCTAW INDIAN TRIBE IN MISSISSIPPI, 1830

■ Our starting point is the Act of March 1, 1817, and the Resolution of December 10, 1817, 3 Stat. 348, 472, admitting Mississippi as the Twentieth State of the American Union on an equal footing with the other states. This endowed the State with inherent police power over all territory and inhabitants within its exterior boundaries except where pre-empted by the federal government. From 1817 to 1830 Mississippi state police power over the Choctaw Indian Tribe, and the lands it occupied, may be said to have been pre-empted by the national government. Nevertheless, by the Treaty of Dancing Rabbit Creek the United States formally relinquished that pre-emption.

Prior to the year 1871, the United States in its dealings with the various Indian tribes customarily resorted to treaties which were formally ratified by the United States Senate. Before the year 1830 the United States had made at least eight treaties with the Choctaw Indian Tribe. See detailed tabulation, *United States v. State Tax Commission of the State of Mississippi, supra,* 505 F.2d at 639. The final treaty before the Tribe moved to the Indian Territory was signed September 27, 1830, on Dancing Rabbit Creek, near present day Macon, Mississippi. Except for the preamble, the Senate ratified the treaty on February 24, 1831, 7 Stat. 333. The Tribe ceded

10,500,000 acres, the last of its Tribal domain in Mississippi, from which nineteen counties were later formed.

Article III of the Treaty specified that "[T]he Choctaw nation of Indians *consent* (emphasis ours) and hereby cede to the United States, the entire country they own and possess, east of the Mississippi River; and they agree to move beyond the Mississippi River, early as practicable . . . .".

The Treaty, however, required no Choctaw to leave his ancestral home. Permission to remain and become citizens of the states was expressly granted in Article XIV:[4]

> "Each Choctaw head of a family being desirous to remain and become a citizen of the States, shall be permitted to do so . . . ."

Historians agree that this was a concession to the members of the Tribe who lived in fixed habitations, who strongly opposed leaving their homes, and that without this concession tribal consent to the treaty could not have been obtained.[5]

In the beginning, one third of the Choctaws elected to remain in Mississippi; the others were moved West in 1831, 1832, and 1833. Sporadic migration continued, however, and by 1900 only 2,000 remained in Mississippi, scattered over several Central Mississippi counties.[6] Greenwood Leflore, the head chief of the Choctaw Tribe, chose not to go West, became an immensely wealthy man, and exercised his Mississippi citizenship by serving with distinction in the Mississippi Legislature.[7]

Long before 1850 the land not retained by individual Indians under Article XIV had been sold by the government at its land offices in Columbus and Paulding to private purchasers, with patents issued accordingly.

In 1921 the Supreme Court exhaustively reviewed the *post* treaty status of the Mississippi Choctaws, *Winton v. Amos,* 255 U.S. 373, 41 S.Ct. 342, 65 L.Ed. 684 (1921). The High Court stated that those Choctaw Indi-

---

**4.** Article XIV.

Each Choctaw head of a family being desirous to remain and become a citizen of the States, shall be permitted to do so, by signifying his intention to the Agent within six months from the ratification of this Treaty, and he or she shall thereupon be entitled to a reservation of one section of six hundred and forty acres of land, to be bounded by sectional lines of survey; in like manner shall be entitled to one half that quantity for each unmarried child which is living with him over ten years of age; and a quarter section to such child as may be under 10 years of age, to adjoin the location of the parent. If they reside upon said lands intending to become citizens of the States for five years after the ratification of this Treaty, in that case a grant in fee simple shall issue; said reservation shall include the present improvement of the head of the family, or a portion of it. Persons who claim under this article shall not lose the, privilege of a Choctaw citizen, but if they ever remove are not to be entitled to any portion of the Choctaw annuity.

**5.** Hearings on the Treaty of Dancing Rabbit Creek before a Subcommittee of the Committee on Indian Affairs on H.R.19,213 (February 14–March 19, 1912, 151 pages):

"The civilized Indians were opposed to the removal because they loved their homes and did not desire to return to the barbaric life", p. 16.

"The insertion of the fourteenth article, as conclusively shown by contemporaneous testimony, was the only method by which the treaty could have been concluded", p. 17.

**6.** McLemore, A History of Mississippi, 1973, p. 88. Anyone interested in the history of this noble tribe of Red men should read: DeRosier, The Removal of the Choctaw Indians, U. of Tennessee Press, 1970; Debo, The Rise and Fall of the Choctaw Republic, U. of Oklahoma Press, 1961; Foreman, Indian Removal, U. of Oklahoma Press, 1953; Foreman, The Five Civilized Tribes, U. of Oklahoma Press, 1934.

**7.** As a Senator, the former Chief grew tired of the well educated Senators sprinkling their speeches with lengthy quotations in Latin and Greek. He retaliated by making a speech in Choctaw, which put a stop to the former practice. He could afford to spend $75,000 of his own funds to construct a road from his home, Malmaison, in Carroll County, to his boat docks on the Yazoo. He declined to support the Confederacy. On his death bed (1866) he insisted that the United States flag be held before his eyes so that it would be the last object he saw on earth. A County (Leflore) and a City (Greenwood) were later named for him. It was the proud, and accurate, boast of the Choctaws that they had never made war on the white man; whereas, their sister tribe, the Chickasaws, delighted in fiercely thrashing the whites on the battlefield, which they often did.

ans remaining in Mississippi after the Treaty

1. Were subject to the laws of the State, and

2. Did not live on any reservation.

By signing and ratifying the Treaty, Congress and the Indians intended and understood that the United States:

1. Formally relinquished its preemptive jurisdiction over these Indians who chose to remain in Mississippi, as well as over the lands they formerly occupied; and

2. Removed the pre-emption impediment to the police power of the State over the former Indian lands and the inhabitants thereof.

The State forthwith began the exercise of that power, previously asserted in a statute enacted in 1829, and thereafter uninterruptedly exercised it, all of which went unquestioned by either the federal government or the resident Indians for more than a hundred years, see *Rosebud Sioux Tribe v. Kneip, Governor of South Dakota,* 1977, 430 U.S. 584, 97 S.Ct. 1361, 1371–72, 51 L.Ed.2d 660; *DeCoteau v. District County Court for Tenth Judicial District,* 1974, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300.

### B

In *Winton v. Amos, supra,* the Supreme Court further stated that the Choctaw Indians remaining in Mississippi:

1. Had no tribal or band organization or laws of their own;

2. The Indian Office and the Department of the Interior (1) regarded these Indians as citizens of Mississippi, (2) assumed and exercised no jurisdiction over them, and (3) never recognized them either individually or as bands.

255 U.S. at 378, 41 S.Ct. at 344.

■ It necessarily follows that by the Treaty of Dancing Rabbit Creek the United States deliberately terminated its guardianward relationship with the Indians who chose to remain in Mississippi. And there is no doubt that these Indians accepted that termination.

"[M]embers of Tribes whose official status has been terminated by congressional enactment are no longer subject, by virtue of their status, to federal criminal jurisdiction under the Major Crimes Act."

*United States v. Antelope,* 430 U.S. 641, 97 S.Ct. 1395, 1399, 51 L.Ed.2d 701. (Footnote 7) (1977).

*Antelope* cited *United States v. Heath,* 9th Cir. 1974, 509 F.2d 16, 19: "While anthropologically [an] Indian even after the Termination Act obviously remains an Indian, his unique status vis-a-vis the Federal Government no longer exists".

"That Indians who had not been fully emancipated from the control and protection of the United States are subject, at least so far as the tribal lands were concerned, to be controlled by direct legislation of Congress, is also declared in *Choctaw Nation v. United States,* 119 U.S. 1, 27, [7 S.Ct. 75, 30 L.Ed. 306, 314,] and *Stephens v. Choctaw [Cherokee] Nation,* 174 U.S. 445, 483, [19 S.Ct. 722, 43 L.Ed. 1041]."

*Lone Wolfe v. Hitchcock,* 187 U.S. 553, 567, 23 S.Ct. 216, 222, 47 L.Ed. 299 (1903).

"Federal regulation of Indian tribes . . . is not to be viewed as legislation of a 'racial' group consisting of 'Indians' ", *United States v. Antelope, supra,* 97 S.Ct. at 1399, citing *Morton v. Mancari,* 417 U.S. 535, at 553, n. 24, 94 S.Ct. 2474, 41 L.Ed.2d 290.

### C

We need not reach or decide whether Congress has the power to reconvert emancipated Indians into wards of the government, or whether once Congress has liquidated Indian tribal status it may reestablish it regardless of intervening history, nor need we decide whether Congress may withdraw a state's police powers over territory or inhabitants once it has been conferred.

Indeed, a diligent search of the statutes has failed to unearth a single instance any-

where in the United States in which Congress has attempted such an act in connection with emancipated Indians, nor have we found any case holding that once Congress totally emancipates an Indian and remands him to the reserved police powers of a state it may thereafter at its unilateral pleasure reassume paramount, plenary jurisdiction over him and the land on which he lives in derogation of the interveningly conferred police power of the state in which the Indian resides.

Quite to the contrary, for over fifty years Congress was persistently pressed to amend, modify, or abrogate provisions of the Dancing Rabbit Treaty with reference to the Mississippi Choctaws and it uniformly declined to do it. The detailed story of these efforts and their corresponding failures appears in *Winton v. Amos, supra.* See also, Hearings on the Treaty of Dancing Rabbit Creek before a Subcommittee of the Committee on Indian Affairs, U. S. House of Representatives on H.R.19213 (February 14–March 19, 1912, 151 pages). See, also, the detailed history recited by Rep. Scott Ferris of Oklahoma on the floor of the House, Congressional Record, Sixty Fifth Congress, Second Session, Vol. 56, part 2, page 1140.

Mr. Ferris asserted that four Secretaries of the Interior, the Dawes Commission, and the House of Representatives, four times by affirmative vote, had held that the Choctaw Indians who remained in Mississippi were not entitled to share in the Indian lands of Oklahoma.

Section 13 of the Indian Reorganization Act of June 18, 1934, 48 Stat. 984, recognized that the Choctaw Indian Tribe was located in the State of Oklahoma and the Tribe was expressly excluded from the provisions of §§ 16, 17, and 18 of the Act for reorganization and self government.

### The Gratuity of 1918

The illustrious John Sharp Williams (assisted by Honorable Pat Harrison and others then members of an outstandingly able Mississippi delegation in the House of Representatives) labored diligently for years to obtain congressional relief for the Mississippi Choctaws as a matter of right under Article XIV. These efforts failed.

At long last, 88 years after the Treaty of Dancing Rabbit Creek, relief came, not as a matter of right but as a gratuity, in the Indian appropriations bill of May 25, 1918, 40 Stat. 561, 562.[8] The bill referred to the "full-blood Choctaw Indians of Mississippi" and to "the relief of [their] distress". It did not refer to them as a tribe. It does not mention a reservation, for there was none. The Commissioner of the Bureau of Indian Affairs, pursuant to a prior appropriation, had been sent to investigate the condition of the Mississippi Choctaws and had formally reported that they did not live on a reservation and he expressly declined to recommend that Congress create one.[9] The

8. For the relief of distress among the full-blood Choctaw Indians of Mississippi, including the pay of one special agent, who shall be a physician, one farmer, and one field mat.on, $5,000; for their education by establishing and maintaining day schools including the purchase of land and the construction of necessary buildings, $20,000; for the purchase of lands, including improvements thereon, not exceeding eighty acres for any one family, for the use and occupancy of said Indians, to be expended under conditions to be prescribed by the Secretary of the Interior for its repayment to the United States, under such rules and regulations as he may direct, $25,000; for the purpose of encouraging industry and self-support among said Indians and to aid them in building homes, in the culture of fruits, grains, cotton, and other crops, $25,000, which sum may be used for the purchase of seed, animals, machinery, tools, implements, and other equipment necessary, in the discretion of the Secretary of the Interior, to enable said Indians to become self-supporting, to be expended under conditions to be prescribed by the said Secretary for its repayment to the United States on or before June thirtieth, nineteen hundred and twenty-five; in all, $75,000, to be immediately available.

40 Stat. 573, § 9.

9. According to the Commissioner's report he spent a great deal of time visiting the Indians, particularly in the Counties of Neshoba and Newton. He reported that "the Choctaws of Mississippi have a very good name as regards honesty, truthfulness, cleanliness, and general morality", adding that "I am not prepared to advocate a reservation for these people".

The Commissioner told that he had asked an aged Choctaw how he would like it if the

bill says nothing about halting state police power over the Indians.

The appropriation was what it declared itself to be: a relief measure, limited to individual Choctaws of the full blood. Only $75,000 was appropriated and it was provided that portions of that sum should be repaid by the Indians, although it appears that almost no repayment was ever made.

Representative Charles D. Carter, born in 1868 near Boggy Depot, in the Choctaw Nation, Indian Territory, said on the floor of the House that *the appropriation was a gratuity*. Congressional Record, Sixty-fifth Congress, Second Session, Vol. 56, part 2, page 6686.

Rather than reflecting a Congressional purpose to amend the Treaty, the lengthy debate on this appropriation demonstrated a fixed Congressional purpose not to alter the Dancing Rabbit Treaty insofar as it pertained to the Mississippi Choctaws.

It is hardly a matter of surprise that, smothered like their white brethren with a hazardous cotton economy and with discriminatory freight rates which stifled industrial development, within a period of nearly twenty years the Mississippi Choctaws paid only $295.11 on the lands which the government bought for them. Congress found it advisable to *place title* to the 3,009 acres acquired under the Act of May 25, 1918, and subsequent similar acts, in the United States "in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior", Act of June 21, 1939 [53 Stat. 851].[10]

This, of course, freed the lands from local, county, and state ad valorem taxation, like other federally owned land, but neither the Committee Report nor the Act says that the emancipated Mississippi Choctaws were thereby made an Indian tribe, or that the lands were to constitute an Indian Reservation (widely scattered as they were), or that Congress was attempting to oust the State of its police power over either the land or individual Indians, any of which could easily have been stated if Congress had had such a purpose.

The Assistant Secretary's 1944 Proclamation, discussed *ante*, was yet five years out in the future. The 1948 Indian Country statute, 18 U.S.C. § 1151, was nine years off. We cannot strain for the implication that Congress in 1939 anticipated either occurrence. The Secretary's letter to the Committee mentioned the possibility that some time in the future these Indians might organize under the Indian Reorganization Act of 1934, but he emphasized that the present purposes of the proposed legislation were that (1) all the Indians could be treated alike, (2) that administrative problems would be avoided, and (3) a more productive use of the lands could be sought. To assume that Congress acted on mere possibilities of future events would be pure speculation.

 It is a cardinal rule that repeals by implication are not favored, that in the absence of some affirmative showing of an intention to repeal the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable, and in the absence of a clear

---

government were to provide him with a team of mules and a wagon. The Indian replied that he would prefer to continue using the hoe because it did not eat and would not be taxed. From the vantage point of 1977 it would appear that this elderly Red Man was in some respects a very wise individual.

Congressional Record, Sixty-fifth Congress, Second Session, Volume 56, Part 2, Page 1138.

**10.** AN ACT

To define the status of certain lands purchased for the Choctaw Indians, Mississippi.

*Be it enacted by the Senate and House of Representatives of the United States of*

*America in Congress assembled*, That title to all lands purchased by the United States for the benefit of the Choctaw Indians of Mississippi under authority contained in the Act of May 25, 1918 (40 Stat.L., 573), and similar subsequent Acts not under contract for resale to Choctaw Indians, or on which existing contracts of resale may hereafter be cancelled, is hereby declared to be in the United States in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior.

Approved, June 21, 1939.

intention to the contrary a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment, *Morton v. Mancari, supra,* 417 U.S. at 550–51, 94 S.Ct. at 2482, 2483.

 We therefore hold that the specific provisions of the Treaty of Dancing Rabbit Creek with reference to the Mississippi Choctaws were not amended, modified or abrogated by the within described Acts of Congress, 1918–1939. We further hold that while the citizens of the State of Mississippi of Choctaw Indian blood are, anthropologically, Indians they are nevertheless subject to the inherent police powers of the State anywhere within its exterior boundaries.

### D

The Secretary's Proclamation of December 4, 1944, Does Not Alter the Result

Notwithstanding the considerations hereinabove discussed, the government argues that

"However, a new reservation involved in this case was established in 1939, pursuant to § 7 of the Indian Reorganization Act of June 18, 1934 . . . for those Choctaws, of one half or more Indian blood, remaining in Mississippi." (Brief, p. 23).

 The insuperable difficulty with this contention is that the Indian Reorganization Act of 1934 was not intended to apply, and does not apply, to the Mississippi Choctaws.

As the unanimous opinion in *Morton v. Mancari, supra,* pointed out, 94 S.Ct. at 2478, the *overriding purpose* of the Act was to establish machinery whereby *Indian tribes* would be able to assume a greater degree of self government; that Congress was seeking to modify the then-existing situation whereby the Bureau of Indian Affairs "had plenary control, for all practical purposes, over the lives and destiny of the *federally recognized Indian tribes* (emphasis ours)."

The Court further said that the ultimate solution adopted by the Act was "to strengthen tribal government while contin-uing the active control of the [Bureau of Indian Affairs], with the understanding that the Bureau would be more responsive to the interests of the people it was created to serve". *Ibid.,* at 2479.

Quite obviously, Congress in 1934 was legislating for Indians in the government-guardian-ward relationship, and not for long emancipated individuals outside that relationship.

 We therefore conclude that the Indian Reorganization Act is of no relevancy to the appropriate disposition of this case. It provided no authority for the Proclamation of the Assistant Secretary in 1944. For that reason alone, the reservations of the Mississippi Choctaws are not in "Indian Country".

And, even if the Assistant Secretary did have that authority, there is nothing in the 1934 Act evidencing an intent on the part of Congress to amend, modify or abrogate the Treaty of Dancing Rabbit Creek or, at one fell swoop, to erase a century of history.

### IV

This raises the cry in the briefs that the Court is annulling the reservations for the Mississippi Choctaws and invalidating the connection being maintained with and for the Mississippi Choctaws by the United States government.

As will shortly be seen this is not at all so.

### V

"[C]ourts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."

*Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290.

The position of the government is that we should look at this case with one eye

closed. It plays down the irrefutable fact that sixty years ago Congress decided to embark upon a policy of benevolences and gratuities to the Mississippi Choctaws, not as a matter of right, not because of the existence of the government-guardian-ward relationship which ordinarily implies preemption and exclusive jurisdiction, but because, as the 1918 debates unmistakably show, Congress had come to the conclusion that these people, the long separated remnant of a noble tribe of Red Men, were morally entitled to help. By its annual appropriations Congress knows that the funds are being administered by the executive offices of the government, that the appropriations for the Mississippi Choctaws are being administered with a "reservation" approach, and that affairs are being conducted as if the Indian Reorganization Act of 1934 did apply. All this is policy inaugurated and implemented by the Executive, in which Congress has concurred so far as appropriations go, without Congress manifesting the slightest suggestion that an attempt to abrogate Mississippi police power over this relatively small number of citizens and over the fragmented "reservations" is a prerequisite to what is being done as a moral, rather than legal, obligation. The 1918 policy was begun at a time when Congress knew that the Mississippi Choctaws had been emancipated in 1831, were not an Indian tribe, and had no reservation. The congressional policy of helping these people simply does not depend on the 1934 Act or the 1939 Act or the 1944 Proclamation, vainly invoked by the government in an effort to support its contention that this is Indian Country.

Our holding that this is not Indian Country in no way affects the legality of the aid being given this group. What Congress is doing here in no way differs from federal aid to drouth-stricken farmers or to flood stricken communities or to small business men or to anybody else for whom Congress finds a good reason to extend the assistance of the taxpayers represented by it. That which is being done to assist the Mississippi Choctaws does not depend, and it does not have to depend, on the traditional "federal guardian"—"Indian ward" relationship.

## VI

## The Result

We hold that the lands in the various tracts of the Mississippi Choctaw Indian "Reservation" are not within "Indian Country", as contemplated by 18 U.S.C. §§ 1151, 1153. We further hold that to date the inherent police power of the State of Mississippi over its emancipated Indian citizens of Choctaw blood stands unimpaired. This, however, has nothing to do with the legality of the congressional policy of benevolence toward the Mississippi Choctaws as begun in 1918 and since pursued.

The District Court was without subject matter jurisdiction of these prosecutions.

The convictions are reversed. The case will be remanded to permit the District Court to set them aside and dismiss the indictment.

REVERSED and REMANDED.

APPENDIX

Office of Indian Affairs.

LANDS ACQUIRED FOR THE BENEFIT OF CHOCTAW INDIANS IN MISSISSIPPI

PROCLAMATION

Whereas, prior to June 18, 1934, and pursuant to authority of and with funds made available by the act of May 25, 1918 (40 Stat. 573), and several subsequent similar acts, approximately 3,550 acres of lands in Mississippi were purchased for the use and benefit of Choctaw Indians of that State;

And whereas, the act of June 21, 1939 (53 Stat. 851) provides:

That title to all lands purchased by the United States for the benefit of the Choctaw Indians of Mississippi, under authority contained in the Act of May 25, 1918 (40 Stat.L., 573), and similar subsequent Acts, not under contract for resale to Choctaw Indians, or on which existing contracts of resale may hereafter be canceled, is hereby declared to be in the United States in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior.

And whereas, on March 30, 1935, the Choctaw Indians resident in Mississippi, of one-half or more Indian blood, pursuant to section 19 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984) voted to accept the

## APPENDIX—Continued

provisions of that act, and subsequently pursuant to Section 5 of said act, approximately 11,600 acres of additional land in Mississippi have been acquired for the use and benefit of the Choctaw Indians of one-half or more Indian blood, resident in that State, the title having been taken in the name of the United States in trust for said Choctaw Indians;

And whereas, none of the previously acquired lands for the benefit of the aforesaid Choctaw Indians is now covered by any outstanding contract or contracts for the resale of any part thereof to any Choctaw or other Indian;

Now therefore, by virtue of the authority contained in the act of June 21, 1939, and in section 7 of the act of June 18, 1934, I hereby declare that the lands in Mississippi acquired by the United States prior to June 18, 1934, for the benefit of the Choctaw Indians of that State are now held in trust by the United States for the benefit of those Choctaw Indians of one-half or more Indian blood resident in that State on January 1, 1940, as shown by the census rolls of the Choctaw Indian Agency, Mississippi, and such other Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as the recognized tribal authorities of the Mississippi Band of Choctaw Indians, with the approval of the Secretary of the Interior, find to be entitled to membership therein; and I hereby further declare that the approximately 11,600 acres of additional land in Mississippi, acquired since June 18, 1934, for the benefit of the Choctaw Indians of that State are hereby added to the land previously acquired and such lands are hereby declared to be an Indian reservation for the benefit of those members of the Mississippi Band of Choctaw Indians, of one-half or more Indian blood, resident in Mississippi and enrolled at the Choctaw Indian Agency as aforesaid.

For convenient identification a legal description of the areas of land acquired for the benefit of the Choctaw Indians and covered hereby, is hereto appended as Exhibit A which is made a part hereof to the same extent as though set forth in full herein.

Done at the City of Washington, District of Columbia, this 4th day of December, 1944.

Oscar L. Chapman,
*Assistant Secretary.*

Exhibit A—Lands Acquired for the Benefit of the Choctaw Indians in Mississippi

*Lands Acquired Prior to 1934*

Attala County—Choctaw Meridian

| | Area (acres) |
|---|---|
| T. 13 N., R. 7 E.: | |
| Beginning 26 chains and 50 links due south of the NE corner of Sec. 3 which corner is evidenced by a Sweet Gum 12 I.D. N. 2 degrees E. 25 links; and a Post Oak 20 I.D. S. 36 degrees W. 66 links on Section line between sections 2 and 3, T. 13, R. 7 E., and running thence due west 3 chains and 31 links to NW corner of this block which is evidenced by a pine 12 I.D. S. 67 | |

, degrees East and Ash 12 I.D. S. 7 degrees, East 38 links. Thence due south 26 chains and 50 links to SW corner of said block, which is evidenced by a Cherry 4 I.D. S. 39 degrees, East 22 links, and a Red Elm S. 77 degrees, East 24 links, both being on West bank of ditch. Thence due east 15 chains and 11 links to SE corner of said block, which is evidenced by a Red Elm 12 I.D. N. 13 degrees, West 8 links, and a Sweet Gum 12 I.D. due North 12 links, thence due north 26 chains and 50 links, to NE corner of said block, which is evidenced by a Sweet Gum 6 I.D. S. 69 degrees, East 3 links, on East side of ditch and a Sweet Gum 4 I.D. S. 45 degrees West 12 links, making the corner in the center ditch. Thence due West 11 chains and 80 links to point of beginning. Containing by survey 40 acres. $31^{27}/_{100}$ acres being partly in W½NW¼ and partly in W½SW¼ of Sec. 2 and $8^{73}/_{100}$ acres partly in NE¼ corner of E½SE¼ and E½NE¼ of Sec. 3. All bearings by Choctaw Cession of 1830 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 40

Jones County—St. Stephens Meridian

| | |
|---|---|
| T. 9 N., R. 10 E.: | |
| Sec. 4, SW¼NW¼, and that part of NE¼-SW¼ which lies north of the old Shubuta and Ellisville Road _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 50 |
| Sec. 5, SE¼NE¼ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 40 |
| T. 10 N., R. 10 E.: | |
| Sec. 34, NE¼NE¼, N½NE¼NW¼, W½-NW¼NW¼, NE¼NW¼NW¼, S½NW¼, N½NE¼SW¼, S½SW¼NE¼, N½NW¼-SE¼ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 230 |
| | 320 |

Leake County—Choctaw Meridian

| | |
|---|---|
| T. 9 N., R. 8 E.: | |
| Sec. 2, NE¼SW¼, W½NW¼, SE¼NW¼ less 10½ acres off the NE part thereof _ _ _ _ _ _ | 149% |
| T. 10 N., R. 8 E.: | |
| Sec. 26, S½NW¼SE¼, E½SW¼, 5 acres off the east end of S½NW¼SW¼ _ _ _ _ _ _ _ _ _ | 105 |
| Sec. 34, S½SE¼ less 14 acres on the East side, NW¼NE¼, N½SE¼ _ _ _ _ _ _ _ _ _ _ _ _ | 186 |
| Sec. 35, NE¼SW¼ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 40 |
| T. 11 N., R. 7 E.: | |
| Sec. 23, SW¼NE¼ less 10 acres in SW corner, one acre in NE corner of NW¼-SE¼ and 1 acre in NW corner of NE¼-SE¼ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 32 |
| Sec. 26, W½SW¼SW¼, NW¼NW¼, N½-NE¼ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 140 |
| Sec. 27, NE¼NE¼, E½SE¼ _ _ _ _ _ _ _ _ _ _ _ _ _ | 120 |
| Sec. 35, SW¼SE¼, S½NW¼SE¼ less 2 acres on east side, E½NE¼, NW¼NE¼, NE¼-SE¼ less 10 acres on east side _ _ _ _ _ _ _ _ _ _ | 208 |
| Sec. 36, W½NW¼NW¼, SW¼NW¼ _ _ _ _ _ _ | 60 |
| | 1,040% |

## APPENDIX—Continued

### Neshoba County—Choctaw Meridian

T. 10 N., R. 11 E.:

| | |
|---|---:|
| Sec. 5, S½NE¼ _____ | 80 |
| Sec. 6, NW¼SE¼ less 1 acre in NE corner _____ | 89 |

T. 10 N., R. 12 E.:

| | |
|---|---:|
| Sec. 17, SE¼SE¼ _____ | 40 |
| Sec. 20, N½NE¼, SE¼NE¼ _____ | 120 |

T. 11 N., R. 10 E.:

| | |
|---|---:|
| Sec. 23, SE¼SE¼ _____ | 40 |
| Sec. 24, W½W½SW¼ _____ | 40 |
| Sec. 25, SW¼SE¼, NW¼NW¼, SE¼SW¼, W½SW¼, 12 acres off south end of NW¼SW¼ _____ | 172 |
| Sec. 27, W½SW¼ _____ | 80 |
| Sec. 36, N½NE¼NE¼, E 60 acres of E½NW¼, N 2 acres of S½NE¼NE¼ _____ | 82 |

T. 11 N., R. 11 E.:

| | |
|---|---:|
| Sec. 19, SE¼SE¼, SW¼SE¼, E½E½NW¼, S½SE¼SW¼, W½NW¼SE¼ _____ | 160 |
| Sec. 30, NE¼ _____ | 160 |
| Sec. 31, N½NW¼ _____ | 80 |

| | Area (acres) |
|---|---:|
| T. 11 N., R. 13 E.: | |
| Sec. 1, NE¼SW¼ _____ | 40 |
| Sec. 2, E½NW¼, W½NE¼ _____ | 160 |
| Beginning at NE corner of Sec. 2 running South 740 yards, thence west 75 yards, thence north 43 yards, thence west 365 yards, thence north 697 yards to north line of Sec. 2, thence east 440 yards to place of beginning _____ | 63.9 |

T. 12 N., R. 13 E.:

| | |
|---|---:|
| Sec. 35, S½SE¼ _____ | 80 |
| Sec. 36, W½SE¼ less 4 acres in SE corner _____ | 76 |
| | 1,512.9 |

### Newton County—Choctaw Meridian

T. 7 N., R. 10 E.:

| | |
|---|---:|
| Sec. 2, W½NW¼, N½SW¼ _____ | 160 |
| Sec. 3, NE¼, N½SE¼, SE¼SW¼ _____ | 280 |
| Sec. 10, NW¼NW¼ less 10 acres off south side _____ | 30 |
| Sec. 11, NE¼SW¼ _____ | 40 |
| Sec. 14, S½SW¼ _____ | 80 |
| Sec. 15, S½SE¼NW¼, N½SW¼, SW¼NW¼ less 5 acres in NE corner, 2 acres in NE corner of SE¼SW¼ _____ | 137 |
| Sec. 23, NE¼NW¼ _____ | 40 |
| | 767 |

### Land Acquired Subsequent to 1934

#### Kemper County—Choctaw Meridian

T. 11 N., R. 14 E.:

| | |
|---|---:|
| Sec. 7, W½SW¼ _____ | 80 |
| Sec. 18, strip 1 acre wide and 3 acres long in NW corner NW¼NW¼ _____ | 3 |

T. 11 N., R. 16 E.:

| | |
|---|---:|
| Sec. 7, N½SE¼, NE¼SW¼, N½SE¼SW¼ | 140 |
| | 223 |

#### Leake County—Choctaw Meridian

T. 11 N., R. 7 E.:

| | |
|---|---:|
| Sec. 23, S½SE¼ lying east of Carthage-Kosciusko Highway, containing 15 acres more or less; N½SE¼ less 1 acre in SW corner thereof, less about 2 acres beginning at NE corner of NW¼SE¼; thence west 25 yards; thence south 97 yards; thence east 100 yards; thence north 97 yards; thence west 75 yards to point of beginning; SW¼SW¼NE¼; 4 acres in NE corner of NE¼SW¼ _____ | 106 |
| S½SE¼ lying west of Carthage-Kosciusko Federal Highway, about 65 acres more or less, and 1 acre in SW corner of NW¼SE¼ _____ | 66 |
| Sec. 35, All that part of NW¼SE¼ which lies east of old Thomastown Road, 10 acres more or less, and tract of 15 acres more or less, situated in NW corner of NW¼SE¼, described as beginning at NW corner of said NW¼SE¼ and run south 220 yards, thence east to old Thomastown Road, thence in NW course along said road to the north line of said NW¼SE¼, thence west to point of beginning _____ | 25 |
| Sec. 36, W½SW¼SE¼ _____ | 20 |

| | Area (acres) |
|---|---:|
| T. 10 N., R. 8 E.: | |
| Sec. 26, SW¼SE¼, SE¼SE¼ less 2 acres in NE corner, 12 acres in S½ and across south end of SW¼SW¼ _____ | 90 |
| Sec. 27, SW¼SE¼ _____ | 40 |
| Sec. 35, E½NW¼NW¼, NE¼NW¼ less 5 acres on east side, E½NE¼SE¼ _____ | 75 |
| Sec. 36, NW¼SW¼, less 3 acres across south side of the big ditch _____ | 37 |

T. 11 N., R. 8 E.:

| | |
|---|---:|
| Sec. 30, about 3 acres in SW corner of SE¼SW¼ _____ | 3 |
| Sec. 31, E½NW¼, W½NE¼, NW¼SE¼ less a strip 40 ft. wide on south side; W½SW¼SE¼ _____ | 219 |
| | 681 |

#### Neshoba County—Choctaw Meridian

T. 10 N., R. 11 E.:

| | |
|---|---:|
| Sec. 6, NE¼SE¼ _____ | 40 |

## APPENDIX—Continued

T. 10 N., R. 12 E.:

Sec. 9, SE¼SE¼ ---------------------- 40

Sec. 14, NW¼SW¼ --------------------- 40

Sec. 15, N½NW¼, SE¼NW¼, SW¼ less 3 acre Baptist Church site in NE corner; and 3.7 acres in SE corner ------------ 280.7

Sec. 20, NE¼NW¼, SW¼NE¼, N½NW¼-SE¼ less 2 acres in NW corner of NE¼-NW¼ ------------------------------ 98

Sec. 21, NE¼, N½SW¼, NW¼SE¼ ------- 280

Sec. 22, NW¼NW¼, NE¼NW¼NE¼, S½-NW¼NE¼, SW¼NE¼ --------------- 110

Sec. 23, W½SE¼ ---------------------- 80

T. 11 N., R. 10 E.:

Sec. 1, all south of Pearl River ----------- 108

Sec. 2, all south of Pearl River ----------- 142

Sec. 3, all south of Pearl River ----------- 101

Sec. 4, all that part of SE¼SE¼ south of Pearl River ----------------------- 35

Sec. 8, all section 8 east of Pearl River ---- 269

Sec. 9, NW¼, S½SW¼, NW¼SW¼, E½NE¼, SW¼NE¼, S½NW¼NE¼, W½SE¼ ----- 500

Sec. 10, all -------------------------- 640

Sec. 11, N½N½, SW¼NE¼, N½SE¼NE¼, SW¼NW¼, less 2 acres in SW corner and 22 acres in NE corner of NW¼SW¼ ---- 282

Sec. 12, E½, NW¼, S½SW¼ ------------ 560

Sec. 13, W½, SE¼SE¼, N½S½NE¼, N½-NE¼, W½SE¼ ---------------------- 560

Sec. 14, SW¼SW¼, E½NE¼, SW¼NW¼, S½NE¼SW¼, NW¼SW¼, SE¼SW¼, SE-¼ ---------------------------------- 420

Sec. 15, SE¼SE¼, NE¼, E½NW¼ ------- 280

Sec. 17, NE¼NE¼ --------------------- 40

Sec. 18, SE¼SW¼, S½SW¼, SE¼ -------- 60

Sec. 19, E½NW¼ --------------------- 80

Sec. 21, E½NE¼, E½W½NE¼, E½SE¼ --- 200

Sec. 22, N½, SE¼, E½SW¼, SW¼SW¼, 15 acres off south side of NW¼SW¼, N½-SW¼, SW¼ ------------------------ 635

Sec. 23, W½W½, SE¼SW¼ ------------- 200

Sec. 24, E½, E½W½, E½W½SW¼ -------- 520

Sec. 25, SE¼NE¼ less 3 acres in SW corner, 1 acre in NE corner NE¼SE¼ --------- 33

Sec. 26, NE¼NW¼, NW¼NE¼ less 10 acres across east side ---------------------- 70

Sec. 27, all land north of Philadelphia & Edinburg Highway in NE¼NW¼, N½-NW¼NW¼, 2 acres more or less in NW corner of S½NW¼NW¼, NE¼NE¼, that part of NW¼NE¼ north of highway 16 -- 85

Sec. 28, E½NE¼, W½NW¼ less 3 acres in NW corner & less 8 acres in SW corner and E½NW¼ ---------------------- 229

Sec. 36, W½W½SE¼NW¼, S½SW¼NW¼, S½N½SW¼NW¼, W½NE¼, SE¼NE¼, south 18 acres of NE¼NE¼, W½SE¼, SE¼SW¼, S½NE¼SW¼ -------------- 318

T. 11 N., R. 11 E.:

Sec. 19, NE¼SE¼, E½NW¼SE¼, W½SW¼, NE¼SW¼, N½SE¼SW¼, W½W½NW¼, E½SW¼NE¼ ----------------------- 260

Sec. 30, W½W½NW¼, 1 acre in NW corner NW¼SW¼, SE¼NW¼, E½SW¼NW¼, 2 acres starting in NW corner of E½NW-¼SW¼, E½SW¼SW¼, SE¼SW¼, NE¼-NW¼, E½NW¼NW¼ ---------------- 223

Sec. 31, S½NW¼ ---------------------- 80

T. 11 N., R. 13 E.:

Sec. 1, NW¼NE¼, west 6 acres of NE¼-NE¼, north 6 acres of SW¼NE¼ ------- 52

Sec. 2, W½NW¼, NW¼SE¼, NE¼SW¼ --- 160

Sec. 3, NE¼ -------------------------- 160

T. 12 N., R. 13 E.:

Sec. 35, S½NE¼, N½SE¼, E½SW¼ ------ 240

Sec. 36, SW¼NE¼, W½SW¼, NE¼SW¼, SW¼NW¼, 4 acres in a square in the SE corner of SW¼SE¼ ------------------- 204

8,719.7

### Newton County—Choctaw Meridian

T. 7 N., R. 10 E.:

Sec. 3, NE¼SW¼, S½SE¼ -------------- 120

Sec. 4, SW¼SE¼, N½NW¼ ------------- 120

Sec. 5, NE¼NE¼ ---------------------- 40

Sec. 8, NW¼, N½NE¼SW¼ less 2 acres, SE¼SW¼, S½NE¼SW¼ less 2 acres ---- 236

Sec. 9, NE¼NE¼ ---------------------- 40

Sec. 10, W½NE¼ and 6 acres off north side of NW¼SE¼ and NW¼ less 30 acres off north side of NW¼NW¼, NE¼NE¼ ---- 256

Sec. 14, NW¼NW¼, S½NW¼, N½SW¼ --- 200

Sec. 15, SW¼NE¼, NE¼NW¼ less 1 acre in NE corner -------------------------- 79

Sec. 20, E½SW¼, NW¼SW¼, W½SE¼, SE¼SE¼ less 1 acre in NE corner thereof, S½NE¼, SE¼NW¼, S½NW¼NE¼, S½-NE¼NW¼, SE¼NW¼NW¼ ----------- 409

Sec. 21, N½SE¼ ---------------------- 80

Sec. 22, E½NW¼ ---------------------- 80

Beginning at a point on the east line of NE¼-SW¼ of Sec. 9, said point being 5 chains north of the SE corner of said NE¼SW-¼, and run thence south to the SE corner of SE¼SW¼ of said sec. 9, thence west to the SW corner of SW¼SW¼ of said sec. 9, thence south along the east line of NE¼NE¼ of sec. 17, 5 chains and 33 links, thence west and parallel with the north line of said NE¼NE¼ of said sec. 17, 5 chains and 33 links, thence north 23 chains to the in-

APPENDIX—Continued

tersection of Box Creek as same presently runs, thence in an easterly direction along the center of Box Creek as same presently runs to a point where Box Mill Branch joins said Box Mill Creek, as same now runs, thence in an easterly direction along the center of Box Mill Branch as same now runs to the east line of NE¼SE¼ of sec. 8, thence north along the east line of said NE¼SE¼ of said sec. 8, to a point due west of a point in the center of the lake and Philadelphia Public Road as same now runs, said point being 5 chains north of the intersection of the center of Box Mill Branch as same now runs and the center of Lake and Philadelphia Public Road as same now runs, thence east to a point in the center of the Lake and Philadelphia Road as same now runs, said point being 5 chains north of the intersection of the center of Box Mill Branch as same now runs and the center of the Lake and Philadelphia Public Road as same now runs, thence south along the center of the Lake and Philadelphia Public Road as same now runs 5 chains to the intersection of the center of said Lake and Philadelphia Public Road with the center of Box Mill Branch as same now runs, thence easterly along the center of Box Mill Branch as same now runs to a point due west of point of beginning, thence east to point of beginning, and being wholly within and a part of SW¼ of sec. 9, NE¼NE¼ of sec. 17, and SE¼ of sec. 8.

T. 8 N., R. 10 E.:

Sec. 32, SE¼SE¼ ----------------------

Sec. 33, SW¼ less and except that part lying and being north of Canal.

Total ---------------------------- 1,983

Scott County—Choctaw Meridian

T. 8 N., R. 9 E.:

Sec. 34, S½SE¼NW¼ -------------------- 20

T. 11 N., R. 7 E.:

Sec. 22, NW¼NE¼NE¼ ----------------- 10

Sec. 23, SW¼NW¼, NW¼SW¼ ---------- 80

110

[F. R. Doc. 44–19063; Filed, Dec. 15, 1944; 3:38 p. m.]